McKiNNEY, J.
deliyerecl tbe opinion of tbe Court.
Tbe prisoner was convicted, at tbe June term, 1852, of tbe Circuit Court of "Washington, of tbe crime of. murder in tbe second degree, and sentenced to fifteen years .imprisonment in tbe Penitentiary. To reverse this judgment an appeal in error has been prosecuted to this Court.
Tbe general principles of law laid down by the Circuit Judge, in bis instruction’s to tbe Jury, are not perceived to be erroneous. If tbe charge be subject to criticism, in any respect, it is solely upon tbe ground that tbe legal, principles stated, are not applied as fully and particularly as might have been done to tbe precise state of the facts as presented in the record.
In this view, the only question we think it necessary to consider, is — whether or not the conviction for murder in the second degree is sufficiently supported by the proof.
In respect to the commencement of the rencounter' between the prisoner and the deceased, tbe evidence, as set forth in this record, is by no means satisfactory; a perplexing obscurity and uncertainty rest upon it.
Tbe only witness of tbe scene was Mrs. Hyder; and, in reviewing tbe facts of this case, it cannot escape observation, that her relation to the parties, her condition at the time of the rencounter and the position which she occupied, with reference to the parties, all tend to impair the force of her testimony, as will be noticed more particularly hereafter.
But all considerations effecting her credibility aside, for tbe present. The inquiry is, was the conviction warranted upon her testimony — taking it as undoubtedly *20 true — when viewed in connexion with other facts disclosed in the proof? We incline to think not: to say the least, we entertain strong doubts.
Before noticing the material facts stated by Mrs. Ilyder in her testimony before the Jury, and important facts proved by others, it may be proper to premise, that it appears from the proof that Scott, the deceased, was a married man, whose wife and family resided within about a mile of the prisoner. For a period of perhaps more than ten years there had existed between the prisoner and Scott a constant criminal intercourse, during which the prisoner gave birth to a daughter by him, now some-years of age. A strong mutual attachment seems to have grown up between them, and their treatment of each other was marked by kindness and affectionate regard, except occasionally during the deceased’s fits of intoxication.
It appears that, shortly before the day on which the deceased came to his death, the prisoner had received information that he had laid a plan to get rid of her, and had offered Whitesides a horse to take her out of the country. Mrs. Ilyder states, that on the day Scott was killed, the prisoner — who was her sister — came to her house and inquired for Scott. Witness replied that he had gone up the road a short time before. Prisoner said she intended to give him a good whipping. Scott returned in about an hour, and when the prisoner saw him returning,' she went into an adjoining room, and asked witness to introduce a conversation with Scott, when he came in, about her. Accordingly, witness asked Scott about his having offered White-sides a horse to take the prisoner out of the country; and he replied that he had offered him a horse to *21 do so. After some further conversation, which witness does not detail, Scott went into a back shed, where liquor was kept, drew >a glass of whisky, drank part of it, and set the glass on a bureau that, stood by the side of the room door into which the prisoner had gone. Witness then went into the room where prisoner was, and Scott followed her to the door and placed his hands on each side of the door, which had no shutter. As soon as the prisoner saw that Scott had discovered her, she advanced towards him with her hands raised, but open, as if to attack him, and exclaimed, “yon d — d old son of a bitch.” Scott said, “why, Camilla!” and threw up his open hands, as if to fend off the blows, and backed. They then grappled with each other. Witness was standing behind the prisoner when she and Scott first met, and could not see which caught first. While struggling with each other, they got by the side of a table, on the left side of the door opening into the room into which the prisoner had gone, on which was lying a rolling-pin, belonging to witness, made of yellow poplar, some fifteen inches long, but very light. The prisoner caught the rolling-pin and struck Scott several blows with it about the head and neck, — she struck fast, and gave perhaps ten or fifteen blows. Scott had caught up a chair in his hands, and tried to keep off her blows with it. He held it with the back towards prisoner; made no effort to strike her, either with his hands or with the chair, that witness saw; and caught up the chair after prisoner struck him with the rolling-pin. The chair dropped from his hands and he fell. The prisoner is a very stout woman, stouter than Scott, who had been complaining for some time. When the *22 deceased fell, tbe prisoner cried out — “Lord have mercy, I believe I bave killed bim!” Sbe raised up his bead and shook bim, and seemed very much disti'essed: and when sbe saw that be was dead, sbe commenced crying and screaming, and wringing her bands. This witness proves that tbe prisoner, during her struggle with tbe deceased, received a very severe cut over one of her eyes, and that sbe was bruised both above and below tbe eye, and can’t say that the lick was not struck by Scott; but did not see bim either strike or choke her; and thinks if be bad done either, after they came together, sbe would bave seen it. But, in another part of her testimony, sbe says, “I was behind her, (tbe prisoner,) and could not see Scott when they were grappling with each other. ”
On cross-examination, witness admitted, that sbe bad been on ill terms with tbe prisoner for years; and bad not talked with her in twelve months before tbe day on which Scott was killed. Sbe also stated that Scott came to her bouse very often to get liquor. Sbe also admitted that, for a dollar promised her by Scott, a few nights before bis death, sbe bad consented to meet bim at a grocery not far from her bouse, and sleep with bim all night, while her husband was away from home fishing; and that sbe went to tbe grocery, but found bim asleep and very drunk; and that sbe took bis purse and pocket book and gave them to her bus-band, when be came home, and told it as a joke; and that her children were with her. Sbe further stated, that sbe bad not drank a drop of liquor on the day Scott was killed.
Isaac Hartsell proves that be was at Hyder’s a few minutes after Scott was killed — describes tbe* rolling- *23 pin as eight or ten inches long, two or two and a half inches through, and as weighing perhaps less than one pound. He was well acquainted with the above named witness, Mrs. Iiyder; that she had been drinking; and, from her breath and conduct, had no doubt but that she felt the effect of liquor at the time he got to the house; but that she was not so much intoxicated as not to know what she was about.
Russel Garland and Rosannah Bean — the former the son, and the latter the mother, of the prisoner— prove that the bone above the prisoner’s eye was, and still remains, indented by the blow received. The first named witness also, states, that on the next morning after Scott was killed, he saw marks on both sides of the prisoner’s neck. The last named witness states, that two weeks after Scott’s death, she saw marks upon the prisoner’s throat which looked blue. Jonathan "Wright proves, that on the day Scott was killed, he saw several scratches on the prisoner’s neck.
Other matters disclosed in the evidence we pass by, as unimportant to be noticed in the view which we have taken of the case, and proceed to inquire whether, upon the foregoing facts, the crime of ’ murder in the second degree, or murder at Common Law, is sufficiently established.
The conviction, if supported, must be rested alone upon the testimony of Mrs. Iiyder; and, as already remarked, there are circumstances in the case which cannot but tend to weaken the force of her evidence. The previous state of ill-feeling, of long standing, between the witness and the prisoner; the high probability of the truth of the suggestion — dimly shadowed forth in the proof — that the witness, by her acts, had *24 succeeded in supplanting tbe prisoner in the affections of the deceased, and had herself become, or at least endeavored to become, his ganxmowr. Iler situation at the time — as proved by other testimony, in contradiction of her positive declaration — being in a state of partial intoxication, and her degradation of character and feeling, to which she confesses with such unabashed assurance; are considerations which, taken all together, may well be allowed to diminish confidence in the truth of her testimony.
But even supposing there were nothing in the case to detract from her credibility, to what weight is her testimony entitled, when taken in connexion with other facts proved in the case, by witnesses of equal claims to credit, so far as we can see from the record before us ?
True, she says the prisoner advanced, with her open hands raised, as if to attack Scott; and he threw up his open hands, as if to fend off her blows, and backed. They then grappled with each other. But the witness expressly admits that she was standing behind the prisoner, when she and Scott came in contact, and could not see which caught first. She again repeats, that she was standing behind the prisoner, and could not see Scott, when he and the prisoner were grappling together. She says she did not see him either strike or choke the prisoner, and ventures the opinion that, if he had done either, she would have seen it. This, to say the least, would seem to be a rash and inconsiderate statement, not to be reconciled with other assertions made by the witness. If she occupied such a position as that she could not see which caught the other first, and could not see Scott at all while he was grappling with the prisoner, how can she hazard *25 even, an opinion that, while- she was in snch a position, and while the parties were thus in conflict, Scott might not have choked the prisoner, or given her a blow3i without the witness having seen it? But it is stated by the witnesses, before named, that there were marks on the neck of the prisoner. If this be true, those mai’ks must have been made during the conflict described by Mrs. Hyder; and must have been made by grasping her throat, in a-vigorous attempt to choke her. If so, by whom, were they made ? — and at what stage of the rencounter? If made at all, that they were made by the deceased,' can admit of no doubt; and that they were inflicted at the commencement of, or early in the struggle between the parties, is no less certain. The deceased could not have choked the prisoner after he got hold of the chair in his hands; and, according to the proof of Mrs. Hyder, he caught up the chair after the- prisoner commenced striking him with the rolling-pin. Hpon the hypothesis that the prisoner was choked, the probability is that the deceased seized her by the throat when she first advanced upon him, or soon thereafter; and nothing in the case excludes the possibility that the prisoner may have laid hold of the rolling-pin to aid in relieving herself from his grasp.
Upon the assumption, then, that the prisoner was choked in the struggle — an assumption made probable by the testimony of Garland, "Walker and Bean, and not at all contradicted by the testimony of Mrs. Hy-der ; and that it took place at the time and. under the circumstances indicated — we have no hesitation in saying that the homicide would not amount to murder in the second degree. Malice, in the proper sense of *26 tbat term, could not be predicated of sucb a billing. Tbe fact tbat tbe prisoner went in pursuit of Scott to tbe bouse of Mrs. Hyder — tbat sbe previously declared sbe would give bim a good whipping — and tbat sbe advanced upon bim, with ber open bands raised, when be approached tbe door of tbe room where sbe bad concealed herself, to learn from his own lips whether, indeed, he bad seriously resolved to cast ber off and stealthily force ber away from ber home and ber friends? after having dishonored ber, made ber tbe mother of a daughter now verging upon womanhood, and sustained tbe relation of husband, facto, to ber for a long series of years: — all these facts will perhaps be entitled to but slight consideration, when proper allowance shall have been made for tbe utter exasperation, and desperation of feeling which the avowal of such a determination, on tbe part of tbe deceased, may well be supposed to have excited in tbe breast of one even so debased as tbe prisoner.
Tbe result is, tbat, in our view, tbe facts of tbe case are involved in too much doubt and uncertainty to warrant tbe conviction; we therefore reverse tbe judgment and remand tbe case, to tbe end tbat, upon another trial, tbe facts may be more fully and clearly ascertained.