ELIJAH LEONARD v. THE STATE.*

*(Nashville.* December Term, 1926.)

Opinion filed April 13, 1927.

1. **CRIMINAL LAW. New trial. Newly discovered evidence.**

When a new trial is sought on grounds of newly discovered evidence, reasonable diligence must appear, and affidavit of accused showing the materiality of such evidence, which should be corroborated by that of the witness, and that such facts have not been communicated to the defendant before or during the trial. (Post, p. 327.)

Citing: Ross v. State, 130 Tenn., 387.

2. **SAME. Same. Action of judge on issue of fact, during trial.**

In reviewing the action of the trial court on an issue of fact of occurrences during the trial this court must sustain the trial court if there is any evidence to sustain. (Post, p. 328.)

Citing: Percer v. State, 118 Tenn., 765, 773; Sherman v. State, 125 Tenn., 19, 60; Thomas v. State, 109 Tenn., 684.

3. **SAME. Same. Same. Credibility of witness.**

The verdict and judgment of the trial court must be accepted as a conclusive determination of the issues of the fact depending upon the credibility of the witness, especially if the plaintiff in error is not corroborated. (Post, p. 329.)

4. **HOMICIDE. Provocation as an excuse. Grudge.**

When an old grudge is clearly proven between the parties to a homicide, the law presumes that the killing occurred on account

---

*Absence of accused during trial in criminal case as grounds for new trial, see 20 R. C. L., 232.

Necessity that passion be engendered by adequate provocation to reduce murder to homicide, see annotation in 5 L. R. A. (N. S.), 812; 13 R. C. L., 791.

of this old grudge, unless the proof shows a new and sufficient provocation, then the law would presume that the killing was a new provocation. (Post, p. 336.)

Citing: Williams v. State, 3 Heisk. (50 Tenn.), 376, 390; Mitchell v. State, 8 Yerg. (16 Tenn.), 514.

5. **SAME. Same. Provocation. Passion or excitement in mitigation.**
If the design to kill was formed with deliberation and premeditation it is immaterial that the defendant was in a passion or excitement when the design was carried into effect. (Post, p. 337.)

Citing: 29 Corpus-Juris, 1116-1117; Clark v. State, 28 Tenn. (9 Humph.), 455.

**Held,** facts warrant verdict of murder in first degree. (Post, p. 339.)

---

*Headnotes 1. Criminal Law, 16 C. J., sections 2708, 2728 (Anno); 2. Criminal Law, 16 C. J., section 2630; 3. Criminal Law, 17 C. J., section 3593; 4. Homicide, 30 C. J., section 559; 5. Criminal Law, 17 C. J., section 3596; 6. Homicide, 30 C. J., section 351 (Anno).

## FROM KNOX.

Appeal from the Criminal Court of Knox County.— Hon. T. A. R. NELSON, Judge.

FRED C. HOUK, BOYD McCALLA and GORDON MYNATT, for Elijah Leonard.

ROY H. BEELER, Assistant Attorney-General, for State.

MR. JUSTICE SWIGGART delivered the opinion of the Court.

The plaintiff in error, Elijah Leonard, has appealed from a judgment rendered by the criminal court of Knox county in January, 1925, upon a conviction for murder in the first degree.

The jury fixed the punishment of the plaintiff in error at death by electrocution, and the judgment of the criminal court was in accord therewith.

Four assignments of error have been made by the plaintiff in error in this court.

The fourth assignment is that the trial court erred in overruling an application for a continuance.

We do not find any ruling in the transcript to which this assignment of error can be applied. Affidavits of the plaintiff in error and his attorneys are copied in the transcript, separate and apart from the bill of exceptions, but were neither made a part of the bill of exceptions nor a part of the technical record. They purport to set out reasons for a continuance, but there is nothing to show that they were ever called to the attention of the trial judge, or that the trial judge was asked to rule on any application for a continuance. We have, however, examined the affidavits, and fail to find them sufficient to entitle the plaintiff in error to a continuance, if, in fact, they were presented to the trial court.

The fourth assignment is accordingly overruled.

The third assignment is that the trial court should have granted a new trial in order that the plaintiff in error might have the benefit of the testimony of Maggie Stone. This witness was an inmate of the county jail, and, as such, became acquainted with the plaintiff in error. She claimed to have witnessed the homicide, and testified that at the time the plaintiff in error struck his wife, he was engaged in a scuffle with his wife and one or two of her sisters. Not only does it fail to appear on the record that the testimony of the witness was newly discovered, within the rule stated in *Ross* v. *State,* 130 Tenn., 387, but it appears that the testimony of the wit-

ness would have been in conflict with that of the plaintiff in error, who made no claim that he was engaged in such a struggle at the time he killed his wife. His defense was solely and altogether that he killed his wife because of sudden and uncontrollable impulse, aroused by statements of his wife, and that, on that account, he was not guilty of a deliberate and premeditated homicide.

We are, therefore, wholly unable to find any error in the action of the trial judge in refusing to grant a new trial because of Maggie Stone's testimony.

By the second assignment of error it is contended that a new trial should have been granted because a part of the trial was conducted in the absence of the plaintiff in error.

It appears from the evidence heard by the trial judge that, at the close of the argument of one of the attorneys for the plaintiff in error, the latter, at his own request, was taken by an officer into the jury room and into a closet opening into the jury room, but not out of hearing of the court room.

Mr. Harless, the court reporter engaged in reporting the trial, had his attention particularly directed to the incident, and testified that no door was closed between the plaintiff in error and the court room at any time.

One of the attorneys for plaintiff in error testified to the contrary as to one of the doors.

The officer testified that the attorney for the plaintiff in error had concluded his argument when the plaintiff in error left the court room, and that the attorney for the State had been up a short time when the plaintiff in error returned. The officer testified, "We was coming back when he commenced, was the way it happened." He further stated that the plaintiff in error could hear every word said at all times.

In reviewing the action of the trial judge on this issue of fact, we are required to sustain the trial court if there is any evidence to sustain him. *Percer* v. *State,* 118 Tenn., 765, 773; *Sherman* v. *State,* 125 Tenn., 19, 60; *Thomas* v. *State,* 109 Tenn., 684.

We think the evidence sustains the finding of the trial judge that no substantial part of the trial took place in the absence of the plaintiff in error, and that the assignment of error is without merit.

The first and remaining assignment of error is that the evidence preponderates against the verdict and in favor of the innocence of the plaintiff in error of the degree of homicide of which he has been convicted.

Learned counsel, appointed by the court for the plaintiff in error to present his appeal, has made an earnest and sincere plea that the evidence heard by the jury fails to show the guilt of the plaintiff in error of a degree of homicide higher than murder in the second degree. It is argued that the elements of premeditation and deliberation are wholly lacking.

On the evening of August 27, 1925, about dusk, the plaintiff in error killed his wife by cutting her throat with a knife. It is the theory of the State that the plaintiff in error had long been jealous of his wife, and on account of a growing indifference towards him on her part he had both contemplated and threatened to kill her, and that the homicide was the result of such deliberate and preconceived purpose.

The plaintiff in error is a negro man about twenty-seven years of age, and his wife, Anna Leonard, was about twenty-two years of age. They were married in January, 1925, after a short acquaintance. The record indicates that the plaintiff in error and his wife were happy and contented with each other for only a few

months. The plaintiff in error testified that both his wife and her mother, Eva Simpson, were wholly dissatisfied with his earning capacity and constantly complained that he did not furnish enough money for the household expenses. The complaint of the plaintiff in error covers pages of the transcript, and is a long narrative of domestic abuse and grievance. He testified that on one occasion his wife assaulted him with a hatchet, in which she was assisted by her mother, and that he was driven from home. Just when this occurred does not appear, but the plaintiff in error testified that at the time of the homicide his personal effects were at the home of another negro woman.

Eva Simpson testified that the deceased did not assault the plaintiff in error with a hatchet, but that on one occasion the plaintiff in error engaged in a struggle with his wife, and that she intervened and pushed the plaintiff in error out of the house or off of the porch.

Luke Oliver, a witness for the plaintiff in error, testified that he passed the latter's home one evening and saw the plaintiff in error, running out of the house and into the street, accompanied by some loud talking; and he reported the statement of the plaintiff in error as follows:

"Seemed like they was fussing or something and I said Lige what is the matter and he said they won't let me stay here and I said why, and he said, because I don't pay rent and give them all the money and pay all the bills and I said why don't you take your wife out and get a house of your own and he said, well I have tried to get her to do so but she won't do it."

Lon Williams testified that on the Sunday preceding the date of the homicide the plaintiff in error asked him if he knew of his wife going with another man, and said, "Well I have heard that she did and if I was to catch them I would kill them both."

Harve Donahue testified that about a week before the homicide he was at the home of the plaintiff in error, and that the latter was sharpening a long bladed knife; that the plaintiff in error looked "mean," and that he asked the plaintiff in error why he was sharpening the knife, to which the latter replied, "I am going to kill up somebody."

John Easterly testified that about a month before the homicide the plaintiff in error talked to him about his wife, and a possible lover, and said, "If I ever find them together I am going to kill both of them. I love her and I ain't going to stand for it."

On the day of the homicide the deceased left her home about 4 p. m., with her two sisters, Jennie Cotton and Minnie Simpson, aged twenty and sixteen, respectively. She said she was going to her Uncle Frank's, and the plaintiff in error, who was sitting in the room, was not invited to go. After the party left the plaintiff in error talked about his wife to his mother-in-law, and stated that he was "stirred up" because he couldn't get his wife everything he wanted to, and the mother-in-law then proceeded to urge him to get a job and go to work. The plaintiff in error left with the statement that he was going over to "Uncle Frank's."

The two sisters of the deceased testified that they went to Uncle Frank's and remained there awhile, and then went to a park for negroes in that section in the city of Knoxville; that they passed the home of Lon Williams, and Jennie Cotton asked Williams to go to

the park with her, which he did; that Williams and Jennie Cotton sat in a swing in the park, and that the deceased and Minnie were sitting on a bench on the other side of the park. Minnie testified that while she and the deceased were sitting together, with no one else present, the plaintiff in error came up and called his wife to him; that they started off together, and Minnie asked the deceased where she was going; that she replied she was going home but would be back, and thereupon Minnie went across the park to inform Jennie Cotton what had occurred. Receiving this information Jennie Cotton made a remark indicating apprehension of trouble, and thereupon Minnie and Jennie ran after the deceased and plaintiff in error, and overtook them on the pike just outside the park. Jennie Cotton and Williams corroborate Minnie in this testimony.

It was urged in the argument that Minnie and Jennie Cotton did not see the homicide because they were too far away, but they testified that they had overtaken the couple when the plaintiff in error struck the first blow, and the plaintiff in error testified that while he was talking to the deceased "about that time Jennie and them walked up there."

Jennie Cotton testified that she was close to the plaintiff in error and his wife, and did not hear them say anything; that the plaintiff in error threw his arm around his wife's neck and cut her with a knife; that the deceased sat down on the bank at the side of the road, and she (Jennie) told Minnie to run for the law; that she then started to the deceased and the plaintiff in error turned on her and cut her leg; that the deceased then told her to go and get her mother, and plaintiff in error again turned to the deceased and cut her a second time, almost severing her head from her body. The

wound inflicted on Jennie Cotton was a severe one, and she stated it required one hundred and twenty-five stitches. The plaintiff in error left the scene of the homicide without any statement or remark.

Minnie Simpson testified that when the plaintiff in error left the park he had his right hand in his pocket and did not remove it while she saw him; that when she and her sister overtook the plaintiff in error and his wife, she called to them to wait and they stopped, and when she and Jennie came up the plaintiff in error cut his wife the first time, and Jennie told her to run for the law, which she did, and she saw no more of the difficulty. When she returned her sister was dead.

When the plaintiff in error left the scene of the homicide he proceeded to the home of Emma Brooks, a negro woman who had been arrested for cohabiting with the plaintiff in error sometime before his marriage to the deceased. He told this woman what he had done, and in explanation said to her that he asked the deceased if she didn't want to live with him any more, to which she replied "No;" that he thereupon "flew crazy" and reached up and grabbed her and didn't remember anything further.

The plaintiff in error testified that his statement to Emma Brooks was as follows:

"A. I left the boy and walked on up the street, and I called Emma after this boy quit talking to me, and I said, Emma I have killed my wife and she said, what did you do it for, and I said, Emma, I said, Emma I tell you, the girl treated me so bad and in taking my labor and then told me to beat it, or run away, and I just couldn't help it.

"Q. You were so mad that you couldn't hold yourself? A. I couldn't govern my temper."

The plaintiff in error left Emma Brooks and went to the home of another negro woman, Josie Singleton, and told her of the homicide, but gave no explanation. He then concerned himself with flight, and was arrested in Atlanta some weeks later.

The version of the homicide given by the plaintiff in error is that after leaving home on the afternoon in question, he went to the home of "Uncle Frank," and, looking through the window, saw the three sisters with two negro men, one of whom was Lon Williams. He testified that his wife was sitting on the lap of the other negro man, whom he did not know. The plaintiff in error testified that he did not make his presence known, but proceeded elsewhere, and had an interview with a negro boy, to whom he had previously loaned money, but whose name he did not know; that this boy told him his wife was interested in another man and would be with him that night at a dance. It is impossible to follow the narrative given by the plaintiff in error of his movements, but he stated that he finally reached the park, above referred to, and there saw his wife and Minnie seated on a bench with two negro men, one of whom had his arm around his wife. The plaintiff in error testified that he called his wife to him; that she came reluctantly; that the conversation which ensued between them was characterized by abuse on the part of his wife towards him; that she called him "a damn fool" and otherwise cursed him, and finally told him that she had another man, but that regardless of how many men she had the plaintiff in error would have to take care of her, and his testimony is that after this statement of his wife he remembered nothing until he found himself on his knees saying, "Lord have mercy I have killed my wife." He testified that after he got up from his knees Jennie Cotton ran up and

hit him in the back of his head; that he threw his arm back of him, but didn't know that he had cut the girl and didn't intend to do it.

The plaintiff in error made a general denial of the threats attributed to him prior to the homicide, and stated that until the afternoon of the homicide he thought his wife was true to him, except that on one occasion her cousin had told him to watch her; that she wasn't treating him right.

The testimony of the two sisters of the deceased and that of Lon Williams, given before the plaintiff in error had testified, amounted to a denial of the presence of Lon Williams at the home of "Uncle Frank." The two sisters again testified, in rebuttal, that there were no negro men at the home of Uncle Frank on the afternoon in question. Minnie Simpson's testimony is in direct conflict with that of the plaintiff in error in his statement that two men were with Minnie and his wife in the park. In view of this conflict in the testimony, we are bound to believe, in view of the verdict and judgment below, that the plaintiff in error has testified falsely in his claim that he had seen his wife sitting on the lap of a negro man, and in company with a negro man just preceding the homicide.

The testimony of Jennie Cotton that she heard nothing said by the plaintiff in error and his wife just before the homicide is also a contradiction of the testimony of the plaintiff in error that he and his wife were engaged in a heated conversation at the time he struck her; and the plaintiff in error is further contradicted on this point by the testimony of Emma Brooks, and by his own version of the statement he made to Emma Brooks as to the cause of the homicide.

In view of the fact that the verdict and judgment in the lower court must be accepted as a conclusive determination of the issues of fact depending upon the credibility of the witnesses, since the plaintiff in error is not corroborated, the most that can be said for his version of the homicide is that during his conversation with the deceased, while they were leaving the park, the latter told him that she didn't want to live with him any more, as he subsequently quoted to Emma Brooks; but it does not appear that the homicide followed immediately after this statement was made, since Jennie Cotton testified that she heard nothing said just before the homicide.

The question for our determination is whether the homicide was committed upon the sudden provocation occasioned by the statement of the deceased that she did not want to live with the plaintiff in error any more, in such manner as to exclude the elements of deliberation and premeditation.

The threats to kill his wife, which were proven to have been made by the plaintiff in error, referred to the contingency of the wife being found to be unfaithful to the plaintiff in error; but the record clearly shows that for a long time the plaintiff in error had entertained a grievance against his wife, feeling that she was not treating him right. He testified that after the first three months of their married life the deceased would do nothing he wanted her to do, and, as stated above, his narrative of his wife's mistreatment of him consumes a number of pages of the record.

When an old grudge is clearly proven between the parties to a homicide, the law presumes that the killing occurred on this old grudge, unless the proof shows a new and sufficient provocation, and then the law would pre-

sume that the killing was on the new provocation. . *Williams* v. *State,* 3 Heisk., 376, 390.

*Mitchell* v. *The State,* 16 Tenn. (8 Yerg.), 514, was a conviction for murder in the first degree, affirmed by this court within a few years after the statute of 1829, separating murder into two degrees.  The conviction was affirmed upon facts which the majority opinion stated would have warranted the jury in finding a verdict of murder in the second degree.  Mitchell, a young man of good character but ignorant and of weak intellect, engaged in a dispute with an adjoining landowner, and immediately after a controversial retort from the deceased to a statement made by Mitchell, the latter struck the deceased in the back of the neck with the edge of an axe and killed him.

The case was tried below before Judge CARUTHERS, and in his charge to the jury, which is quoted in the opinion of the Supreme Court with apparent approval, Judge CARUTHERS said:

"If the purpose was deliberately formed, and then provocation intervened, and the killing took place, it shall be presumed to have been committed under the influence of passion, and will be murder in the second degree; if the provocation was insufficient to reduce it to manslaughter, unless it is shown that the slayer was prompted, not by passion, but by his previously settled purpose to do the deed."

Corpus Juris, vol. 29, 1116-1117, dealing with the effect of passion, provocation or excitement in the mind of the slayer on the degree of unlawful homicide committed by him, says:

"However, passion does not always reduce the crime since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, al-

155 Tenn.—22.

though prompted and to a large extent controlled by passion at the time. If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect.''

Applications of this principle will be found in our cases of *Clark* v. *State,* 28 Tenn. (8 Humph.), 671, and *Davidson* v. *State,* 28 Tenn. (9 Humph.), 455. In each of these cases the homicide was immediately subsequent to personal difficulties sufficient to create passion in the mind of a reasonable man, but the facts were such that the jury in each case was warranted in reaching the conclusion that the homicide was the result of a deliberate and premeditated purpose and design to kill, formed by the slayer prior to the meeting of the parties at the time of the homicide. In each case a conviction for murder in the first degree was affirmed by this court.

In the present case it was primarily a question of fact for the determination of the jury and trial judge whether the killing was the result of a purpose deliberately formed by the plaintiff in error before his conversation with the deceased, which immediately preceded the homicide; whether the statement of his wife that she did not want to live with him longer, if made, amounted to provocation by which his passion was aroused; and whether, if such provocation and passion existed, the homicide was the result of such passion or of the previously settled purpose of the plaintiff in error to do the deed.

The verdict and judgment of the trial court must be construed as a finding of these issues of fact against the plaintiff in error; and in reviewing such finding we cannot disturb the verdict unless it is against the preponderance of the evidence.

We are not impressed with the protestations of the plaintiff in error of affection for his wife. He seems to have been amply supplied with other comforters, for immediately after the homicide he repaired to the home of a former intimate, and at that time his personal effects were at the home of another negro woman, Helen Seahorn, whose reputation was not good.

As stated herein, Emma Brooks, testified that the plaintiff in error explained the homicide by telling her that the deceased said she didn't want to live with him any more.

The plaintiff in error undertook to repeat in his testimony what he said to Emma Brooks, as follows: ''I said Emma I tell you the girl treated me so bad and in taking my labor and then told me to beat it, or run away, and I just couldn't help it.''

This is, in effect, an interpretation by the plaintiff in error of his own reaction at his wife's treatment of him. It was not a sense of unrequited affection, but a sense of ingratitude for material support which the plaintiff in error describes as the motive which prompted him.

This feeling on the part of the plaintiff in error did not come into existence at the time of the homicide. He had entertained such a grievance for sometime, as the record clearly shows.

The testimony offered by the State as to what occurred when the fatal blows were struck tend strongly to negative the existence or manifestation of passion by the plaintiff in error.

Minnie Simpson did not observe anything unusual in the attitude of the plaintiff in error when he called his wife to him, and she reported to Jennie Cotton only the fact that the plaintiff in error had come and that his wife had gone home with him. The apprehension of trouble,

which caused Jennie Cotton to immediately run after the couple was clearly the result of the previous relations of the couple within her knowledge.

Minnie Simpson testified that the plaintiff in error had his right hand in his pocket all the time she saw him. The statement of the plaintiff in error and that of Jennie Cotton, as to the striking of the first blow with the knife, clearly implies that the knife was already open when the plaintiff in error drew it, showing that its use was anticipated by the plaintiff in error.

The assault on the woman was made by the plaintiff in error while her two sisters were approaching. He must have realized that if he waited longer the two sisters might prevent him from putting his purpose to kill his wife into effect. Jennie Cotton stated that she heard nothing said by either party just before the plaintiff in error struck the first blow with the knife, and it is fair to infer that the approach of the two sisters impelled the plaintiff in error to strike at the particular time. This inference is re-enforced by the fact that after the plaintiff in error struck the first blow he turned his attention to the elder of the two sisters, who was approaching the deceased, and inflicted a severe wound upon her, after which the plaintiff in error again turned to his wife and completed the homicide by almost severing her head from her body.

The actions of the plaintiff in error thus described do not indicate passion or sudden impulse, but, with the accompanying circumstances, as shown in the record as a whole, warranted the jury in finding that plaintiff in error had come for his wife with the preconceived and deliberate purpose to kill her, and that the homicide was the result of such premeditated purpose. We do not find

the evidence sufficient to preponderate against this find-ing of the jury and the trial judge.

It results that the assignments of error will be over-ruled, and the judgment of the trial court affirmed. The judgment will be executed on the 25th day of May, 1927, by the Warden of the Penitentiary in the manner re-quired by law and the judgment to be entered herein.