**STATE of Tennessee, Petitioner,**

v.

**James Leon BULLINGTON, Respondent.**

Supreme Court of Tennessee.

Jan. 26, 1976.

John B. Hagler, Jr., Asst. Atty. Gen., Nashville, for petitioner; R. A. Ashley, Jr., Atty. Gen., Nashville, of counsel.

Harold D. Hardin, Gracey, Maddin, Cowan & Bird, Seth Norman, Nashville, for respondent.

## OPINION

BROCK, Justice.

The respondent was found guilty of murder in the first degree for the killing of Orlin Alexander and was sentenced to the penitentiary for a period of 21 years. He appealed to the Court of Criminal Appeals and that Court, in a 2 to 1 decision, found that the evidence preponderated in favor of the respondent upon the issues of premeditation and voluntary intoxication and, accordingly, reversed his conviction of the offense of first degree murder; and, subject to the approval of the State, affirmed a conviction of murder in the second degree with punishment reduced to 10 years in the penitentiary, a procedure authorized by this Court in Forsha v. State, 183 Tenn. 604, 194 S.W.2d 463 (1946). We granted the petition

for certiorari filed by the State seeking to review the action of the Court of Criminal Appeals. The issue is whether or not the evidence preponderates against the finding of the jury that the respondent committed the killing with premeditation and deliberation.

The brief of the State contains a comprehensive summary of the evidence which we paraphrase. The respondent shot and killed Orlin Alexander on July 11, 1972, in Macon County, Tennessee. The respondent, his uncle, Hollis Bullington, and his friend, Lynn Shrum, were the only witnesses to the killing. The uncle testified that respondent picked him up in his pickup truck about 1:00 p.m., that they bought approximately 12 cans of beer, that they drove around through the countryside for a considerable period of time and between 4:00 and 5:00 p.m. went to a deserted farm where they chanced to meet Lynn Shrum who was attending to his dogs. They engaged in a friendly conversation and drank some beer together. The respondent and Shrum struck a bargain whereby respondent purchased from Shrum a .32 caliber Smith & Wesson pistol for the sum of $40.00. Upon obtaining this pistol, the respondent proceeded to test it out by shooting at some beer cans. He succeeded in hitting at least one of the cans. Respondent then placed the pistol and ammunition in his pickup truck which was parked nearby. Sometime thereafter, the deceased, Orlin Alexander, came riding by on his horse and stopped when he reached the respondent, his uncle and Shrum. Both Shrum and Hollis Bullington testified that the conversation was friendly and that no hard feelings were evident. The respondent asked to ride Alexander's horse but Alexander refused the request stating that the horse was not thoroughly broken and, consequently, that respondent might be injured if he attempted to ride the horse. Both witnesses agree that this refusal did not appear to make the respondent angry. All present continued to drink beer and to engage in friendly conversation. Finally, the discussion centered upon politics and elections. Shrum testified that, without warning, the respondent got up, went to his truck and returned with the pistol. Shrum was not alarmed by this and thought that the respondent was preparing to shoot at another beer can. Then, suddenly, Shrum realized that something was wrong. The respondent waved him away with his hand. Shrum said, referring to respondent by his nickname, Pete, "Pete, don't do it. Don't do it." At this point, the respondent said to the deceased, Alexander, "If you don't tell me you are going to vote, I am going to kill you." The deceased replied, "Yeah, I will vote." But despite this reply the respondent proceeded to shoot the deceased twice in the chest, the bullets entering approximately ½ to 1 inch apart. All agree that the deceased was unarmed, but, according to Hollis Bullington, the deceased was moving slightly toward the respondent when he was shot. However, both witnesses insist that neither man showed any signs of anger. Shrum testified that the respondent looked abnormal at the time of the shooting, explaining, "Well, he had lost his color, and his voice was trembling." Shrum was asked, "Have you been around this boy when he was drinking?" to which he answered, "Yes, sir." Shrum was further asked, "Did that appear to you to be what was wrong with him?" Shrum replied, "No, sir, I didn't think he had had that much alcohol." Hollis Bullington testified that the defendant did not act abnormally just prior to the shooting and that the beer which the defendant drank on that day was his first in about nine months. The evidence does not show clearly how much beer was consumed by the respondent prior to the shooting. No motive for the killing was clearly established although it appears from both the testimony of the respondent and his uncle, Hollis Bullington, that a year or two prior to this killing the deceased and the respondent had some kind of altercation at a beer tavern.

As the fatal shots were fired, both Shrum and Hollis Bullington fled the scene, fol-

lowed by the respondent. The deceased was left lying on the ground. Some time later the respondent was arrested several miles from the scene as he walked along a road. Bobby Joe Carman, the Deputy Sheriff, made the arrest and testified that the respondent was staggering down the road at the time he was apprehended. The Sheriff, Maburn Dyer, testified that the respondent was drunk at the time he saw him shortly after the arrest. The Sheriff also testified that a blood sample was taken from the respondent and was tested at the hospital but that the written report of the test results had been misplaced or lost. He stated that his recollection was that the written report indicated that respondent's blood was .31 percent alcohol. Ed Ashburn, an agent with the Tennessee Bureau of Criminal Identification, testified that he talked with the respondent several hours after the crime was committed and that he appeared to be intoxicated at that time. He further testified that the respondent said that he thought he remembered shooting the deceased but that he didn't remember why he had done so.

The proprietor of a grocery store alongside the road where respondent was arrested testified that just prior to the arrest respondent came into his store after leaving his pistol outside on a gasoline pump, purchased a soft drink which he carried with him, went back outside, picked up his pistol and walked on down the road. This witness testified that the respondent did not appear to be acting normally at the time. Another witness, who was acquainted with the respondent, testified that he saw the respondent sitting in the police car after the arrest and that he was drunk, red-eyed and babbling. Still another witness testified that although he was acquainted with the respondent that the respondent did not recognize him after the arrest.

The respondent testified in his own behalf. He stated that he went to his father's house sometime during the middle of the day and then over to the home of Hollis Bullington, his uncle. He returned to his father's house and then went back to his own home. Thereafter he drove out in his pickup truck and chanced to overtake his uncle, Hollis Bullington, who was walking on the highway. He stated that he had had nothing to drink up to that point. The respondent invited his uncle, Hollis Bullington, to go along with him in his pickup truck. They purchased 6 or 12 cans of beer which they proceeded to drink. He stated that they drove around the back roads for a while, watched some people swim and, after an hour or two, went to the deserted farm where they encountered Shrum. The respondent testified that he recalled the deceased getting off his horse but that his memory began to fade at that point. He remembered asking to ride the horse, talking about elections, and some gunshots. He testified that about a year or two prior to the killing he and the deceased, Alexander, had some trouble at a beer joint over a shuffleboard game. He stated that only words were exchanged and that no fight resulted. He denied that any ill will resulted between him and the deceased.

From the foregoing evidence, the jury found that the killing was done with premeditation and deliberation. Does the evidence preponderate against that finding?

The premeditation-deliberation element of first degree murder requires that the act be performed with a cool purpose. *Drye v. State*, 181 Tenn. 637, 184 S.W.2d 10 (1944); *Winton v. State*, 151 Tenn. 177, 268 S.W. 633 (1925); *Turner v. State*, 119 Tenn. 663, 108 S.W. 1139 (1908); *Poole v. State*, 61 Tenn. 288 (1872); *Dale v. State*, 18 Tenn. 551 (1837). In order to constitute murder in the first degree, the cool purpose must be formed and the deliberate intention conceived in the mind of the accused, in the absence of passion, to take the life of the person slain. *Winton v. State, supra*. If the purpose to kill is first formed during the heat of passion, the accused, to be guilty of first degree murder, must have committed the act after the passion has subsided. "Passion" as here used means

any of the human emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection. *Drye v. State, supra.*

"The mental state of the assailant . . rather than the length of time . . . is the material point. . . . The mental process . . . may have been instantaneous, and the question of vital importance is—was the mind, at that moment, so far free from the influence of excitement, or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose; and was the death of the person assaulted, the object sought to be accomplished—the end determined upon." *Clarke v. State,* 218 Tenn. 259, 268, 402 S.W.2d 863 (1966).

■ Once the fact of killing has been established, the law presumes it to be murder in the second degree. *Witt v. State,* 46 Tenn. 5 (1868). And, the burden is upon the state to prove premeditation-deliberation which raises the degree of the crime to first degree murder. *Bailey v. State,* 479 S.W.2d 829 (Tenn.Cr.App.1972). If the killing is accomplished by poisoning or by lying in wait, premeditation is obvious. But, in all other cases a conviction of first degree murder must be supported by evidence of some other kind of willful, deliberate, malicious, and premeditated killing. *Drye v. State, supra.* The nature of the fact to be proven, i. e., the mental state of the accused, is such that ordinarily only circumstantial evidence is available. The circumstances of the killing itself may afford the needed proof. *Bass v. State,* 191 Tenn. 259, 231 S.W.2d 707 (1950). Thus, one way of proving premeditation is to show that past hard feelings existed between the defendant and his victim. *Leonard v. State,* 155 Tenn. 325, 292 S.W. 849 (1927). Another circumstance from which the inference of premeditation may be drawn is repeated shots or blows inflicted upon the victim. *Franks v. State,* 187 Tenn. 174, 213 S.W.2d 105 (1948); *Bass v. State, supra.*

■ Admittedly, the question presented here is a close one, but we are constrained to hold that the evidence supports the finding of premeditation and does not preponderate against it. On the one hand, the failure of the evidence to disclose a motive for the killing is in favor of the respondent, but, on the other hand, the fact that the deceased was unarmed and offered no provocation to the respondent, the lack of any evidence that the respondent's reason was dethroned by anger or any other "passion," the fact that the respondent walked several feet to his truck to obtain his pistol and then walked back toward the deceased while pointing the pistol at him and threatening him despite the pleading of the respondent's friend, Shrum, "Pete, don't do it" and finally the careful and deliberate dispatch of, not one, but two bullets into the breast of the deceased are all circumstances tending to favor the State on the issue of premeditation.

■ We are also of the opinion that the evidence does not preponderate against the finding of the jury upon the related issue of the respondent's intoxication at the time of the killing. Here, too, there is evidence upon both sides of the issue. The intoxication of an accused is no justification for crime, but its existence may negate a finding of specific intent. Thus, when the inquiry is whether or not the accused is guilty of first degree murder, it becomes relevant to know whether or not the accused was in a state of intoxication and, if so, the extent of its effect upon his mental state. Of course, if the voluntary drunkenness of the accused exists to such an extent that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree. *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149 (1945). Moreover, if the intoxication of the accused is not sufficient to render him totally incapable of premeditation and deliberation, nevertheless, the jury may consider his state of intoxication along with all other facts of the case to determine

whether the killing was the result of a premeditated purpose or resulted from passion excited by inadequate provocation; if the former, he is guilty of murder in the first degree, but if the latter, he is guilty only of second degree murder. *Cartwright v. State*, 76 Tenn. 376 (1881); *Lancaster v. State*, 70 Tenn. 575 (1879); *Haile v. State*, 30 Tenn. 154 (1850).

It has been the rule in this state for more than a century that a judgment of conviction in a criminal case will be set aside and a new trial awarded if the appellate court is convinced that the evidence preponderates against the verdict of conviction. *Cochran v. State*, 26 Tenn. 544 (1847); *Garland v. State*, 32 Tenn. 18 (1852). But, in reviewing the evidence upon appeal for this purpose the appellate court must take the verdict as having established the credibility of the State's witnesses and the conviction will not be disturbed unless the evidence clearly preponderates against it and in favor of the innocence of the accused. *Gossett v. State*, 224 Tenn. 374, 455 S.W.2d 585 (1970). A review of the evidence in this case has led us to the conclusion that the evidence does not preponderate against the verdict of the jury finding the respondent guilty of murder in the first degree.

Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the judgment of the trial court in all respects. The respondent will pay the costs incurred in this Court.

FONES, C. J., and COOPER, HENRY and HARBISON, JJ., concur.