# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 13, 2010 Session

## STATE OF TENNESSEE v. VERSHAWN MCCOY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-00659     W. Mark Ward, Judge**

---

**No. W2009-01222-CCA-R3-CD   -   Filed November 9, 2010**

---

A Shelby County jury convicted the Defendant, Vershawn McCoy, of second degree murder, and the trial court sentenced him as a violent offender to twenty years to be served at 100%. On appeal, the Defendant contends that the trial court inadequately responded to a jury question raised during deliberation requesting a definition of "state of passion." After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Robert Brooks, Memphis, Tennessee (on appeal) and Leslie I. Ballin, Memphis, Tennessee (at trial), for the Appellant, Vershawn McCoy.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General, Tom Hoover and Carla Taylor, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the killing of Lee M. Davis on October 21, 2007, for which the

Defendant was indicted for second degree murder. At his trial, the evidence showed that:[1] Brenda Clardy and Shaun Armour, who were boyfriend and girlfriend, both witnessed the shooting in this case during the early morning hours of October 21, 2007. At around 1:00 a.m, Clardy and Armour went to the trailer of a man named "Virgil" to purchase drugs on credit from the Defendant, whom they knew as "Blow," and to borrow a cigarette from a woman named Jennifer Rankin.[2] Clardy, who had known the Defendant for four or five months as someone from whom "everybody would buy drugs," entered the trailer and found the Defendant, the victim, and Destinae Slighton. Clardy recalled the Defendant had previously been mad at the victim, saying he would get "rid" of him, because the victim was trying to take over his drug selling and prostitution ventures, but the two were not actively arguing when she was present in the trailer. Clardy assumed Virgil was sleeping in the back of the trailer. Rankin was acting nervous and told her that "something's fixing [sic] to go down" and that Clardy needed to leave. After the Defendant refused to sell her drugs on credit, Clardy exited the trailer, without drugs or a cigarette, and met Armour, who was waiting for her outside Virgil's trailer.

Clardy and Armour returned to the nearby trailer of their friends Debbie and Ernie, where they were staying at that time. At some point, Clardy heard the Defendant in an argument with the victim over Slighton. Later, Clardy and Armour made a pallet on the floor in the living room, laid down to watch television, had sexual intercourse, and Clardy fell asleep. Armour woke to use the restroom, and he heard the Defendant arguing with the victim outside. He laid back down and heard gunshots at around 4:30 or 5:00 a.m., so he awakened Clardy, and the two looked out the windows of the trailer. The two saw the Defendant shoot the victim, who had fallen to the ground, four or five times. Both denied that a dumpster located near the shooting blocked their view of the shooting. Clardy said she saw the Defendant run toward "Baltic,"[3] but she did not go to a pay phone to call for help because the pay phone was located at the laundromat, which was about thirty or forty feet from where the shooting occurred.

Neither Clardy nor Armour called police to report the shooting. They did not willingly speak with police about the shooting when police arrived and only spoke with police after they were arrested. They remained in the trailer until Sergeant Max picked them

---

[1]Because the Defendant does not challenge the sufficiency of the evidence, the factual summary is presented in the light most favorable to the State.

[2]This witness refers to Jennifer Rankin as "Jennifer Bailey" and says that she is also known as Jennifer Rankin. Jennifer Rankin testified on behalf of the Defendant and stated her name as Jennifer Rankin. Therefore, we will refer to this witness by the name of Jennifer Rankin.

[3]It appears from the context of the testimony that Baltic is a street running adjacent to the trailer park.

up from the trailer and took them to the police department. Armour had previously been banned from the trailer park, a fact about which Clardy was aware.

Destinae Slighton testified the Defendant was her boyfriend at the time of the shooting, and she was pregnant with his child. Slighton gave the Defendant some of the money that she earned as a prostitute, and he bought her clothes and other essentials. Slighton was in Virgil's trailer with Rankin and the victim on the evening of October 20, 2007, for only a short period of time before she left. When she returned, around "the middle of the night," the Defendant, who had been sleeping, became angry with her because she changed clothes in front of the victim, whom Slighton said had previously raped her and beaten her several times. Slighton said she left the trailer again because the Defendant seemed upset and because she was high on crack cocaine and drunk. The Defendant followed her, and the two had a verbal argument behind the trailer park's laundromat about why Slighton was running from him and about what was wrong with her. Slighton struck the Defendant, and he hit her back. As Slighton fell to the ground, she saw the victim approaching, and the victim said to the Defendant, "[W]hy don't you hit me like that?"

The Defendant helped Slighton back to her feet and told the victim that Slighton was his girl and he "got this." The victim grabbed Slighton by her shirt, as did the Defendant. The two were pulling her back and forth, which she said was "more of an annoyance than anything" because she was not being hurt. The two men let go of Slighton, and she ran toward the main street and only stopped when she heard gunshots. Slighton said she turned around and saw the victim falling, and she saw the Defendant standing over the victim. She saw the Defendant point at the victim, and she heard another gunshot. At that point Slighton turned and ran again. A few minutes later, she saw the Defendant and got into a car with him and one of his friends and went to West Memphis.

Charmeia Douglas, an officer with the Memphis Police Department, testified she responded to a call about a body located in Leahy's Trailer Park at around 7:00 a.m. on October 21, 2007. After she and her partner, Robin Bass, arrived, they discovered the victim's body lying face down on some concrete under an awning similar to a metal carport. A dumpster was located near the victim's body.

Two Memphis Police Department officers conducted the crime scene investigation. One officer, Newton Morgan, observed the victim lying in the parking lot of the trailer park, and she processed the scene by marking relevant evidence and drawing a sketch of the scene. Officer Morgan found six .380 caliber bullet casings on the ground near the victim's body and a bullet fragment under the victim's body. On the victim's person, she found a wood-handled steak knife that had a four-and-a-half inch blade. The other officer, Ricky Davidson, noted a large amount of blood at the scene, in addition to the spent casings and the bullet

fragments.

The medical examiner, Miguel Laboy, performed an autopsy of the victim and determined that the victim had been shot in the head twice, in the back twice, in the left arm once, and in the left buttock once. The doctor opined that the cause of death was multiple gunshot wounds, and the manner of death was homicide. A toxicology report indicated the victim had used marijuana before his death.

The Defendant presented two witnesses, Jennifer Rankin and Keith Haney. Rankin, Slighton's best friend, recalled being at Virgil's trailer with Slighton and the Defendant on the night of October 20, 2007. She said she left the trailer and "ran into" the victim, who beat her. After the beating, the victim followed her back to Virgil's trailer, where the Defendant was sleeping. Slighton, who was still at the trailer, helped Rankin clean her wounds and then left the trailer, slamming the door. The noise from the slamming door awoke the Defendant, who left the trailer to ascertain why Slighton had left. Rankin testified that the Defendant and the victim did not argue at all that evening. Further, she said neither Clardy nor Armour came to Virgil's trailer that evening.

Rankin testified that Slighton and the victim had argued the Saturday before the shooting, which was not unusual. Slighton accused the victim of taking all her money and of beating her, an accusation she had made on several previous occasions. Rankin also recalled that, on the night of the shooting, the victim engaged in an altercation with a man named "Moon." Rankin acknowledged she had not seen the shooting and that she had several prior convictions.

Haney, a private investigator hired by the defense, testified that Clardy and Armour may not have been able to see the shooting as they had testified because of the obstruction of the dumpster and poor lighting.

Based upon this evidence, the jury convicted the Defendant of second degree murder.

## II. Analysis

On appeal, the Defendant contends that the trial court erred by declining to give a supplemental jury instruction in response to the jury's question about "state of passion." The State counters first that the Defendant waived this issue by failing to object at trial and by failing to include it in a motion for new trial. Further, the State asserts that this issues does

not qualify for a plain error review.[4]

After a review of the record, we conclude the Defendant failed to object to the trial court's response to the jury's question and failed to raise this issue in his motion for new trial. Consequently, he has waived review of this issue pursuant to Tennessee Rule of Appellate Procedure 3(e).

Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice." Tenn. R. App. P. 36(b). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "'plain' is synonymous with 'clear' or equivalently 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993) (citing *United States v. Young*, 470 U.S. 1, 16 n.14 (1985)). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 732 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our Supreme Court adopted the definition of "substantial right" promulgated by this court in *Adkisson*. There, the Court held that "a 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'" *Adkisson*, 899 S.W .2d at 639. Our Supreme Court also adopted *Adkisson's* five factor test for determining whether an error should be recognized as plain:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is 'necessary to do substantial justice.'

*Id*. (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the

---

[4] Effective July 1, 2009, Rule 52 of the Tennessee Rules of Criminal Procedure was "deleted because harmless error and plain error are covered in amended Tennessee Rule of Appellate Procedure 36(b)." Tenn. R. Crim. P. 52, Advisory Comm'n Cmts. For this reason, all citations regarding the effect of error in this opinion are to Rule 36 of the Tennessee Rules of Appellate Procedure. Our analysis of whether an error qualifies as plain remains the same under either rule.

record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. at 283. To be reviewable as "plain," the error "must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original). Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Benitez*, 542 U.S. 74, 82 (2004).

In the case under submission, the record clearly establishes what occurred in the trial court. At the conclusion of the proof, the trial court instructed the jury as follows:

> Any person who commits second degree murder is guilty of a crime. For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the defendant unlawfully killed Lee M. Davis; and
> (2) That the defendant acted knowingly.
>
> Intentionally means that a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim.
>
> Knowingly means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim. The requirement of knowingly is also established if it is shown that the defendant acted intentionally.
>
> The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.
>
> Any person who commits voluntary manslaughter is guilty of a crime. For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following elements:
>
> (1) That the defendant unlawfully killed Lee M. Davis; and
> (2) That the defendant acted intentionally or knowingly; and
> (3) That the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

-6-

During the jury's deliberations, the jury sent a note to the trial judge that read, "The jury requests a dictionary or written definition of 'state of passion.'" The trial court instructed the jury orally, "I am not giving you a dictionary and I have provided you already with all the instructions applicable." After more deliberations, the jury found the Defendant guilty of second degree murder.

We turn now to examine whether the trial court breached an unequivocal rule of law when it failed to offer the jury a supplemental instruction about the term "state of passion." The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. It follows that a defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000).

"A trial judge has the authority to give supplemental instructions when the jury poses a question that indicates the jurors are confused regarding a question of law." *State v. Dulsworth*, 781 S.W.2d 277, 288 n.6 (Tenn. Crim. App. 1989); *see also U.S. v. Duncan*, 850 F.2d 1104, 1115 (6th Cir. 1988) ("A question from a deliberating jury often represents a pivotal moment in a criminal trial. Particularly in a close case like this, a trial judge has a 'duty of special care' when responding to a request for 'further light on a vital issue' from the foreperson of a confused jury. . . . 'When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.'") (citation omitted); *State v. Forbes*, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). It is appropriate for the jury to be provided with dictionary definitions of words or terms not in common use and not understood by persons of reasonable intelligence. *See State v. Maria Maclin*, No. 02C01-9710-CR-00383, 1998 WL 517839, at *2-3 (Tenn. Crim. App., Jackson, Aug. 21, 1998), *perm. app. denied* (Tenn. Mar. 8, 1999). Further, where supplemental instructions are given, the trial court should also admonish the jury not to place undue emphasis on the supplemental instructions. *Leach v. State*, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977).

We conclude that, in response to the jury's question about the term "state of passion," to offer the jury a supplemental instruction on the phrase "state of passion" by defining the term "passion" would have been appropriate. *See, e.g., State v. Bullington*, 532 S.W.2d 556, 560 (Tenn. 1976) (defining passion). This Court has recently held that held that a trial court, when faced with a jury question about the definition of passion, committed error when it failed to clarify the jury instruction about passion based upon the case law definitions. *State v. Steve Frederick Rickett*, No. E2008-00670-CCA-R3-CD, 2010 WL 1949154, at *28 (Tenn. Crim. App., at Knoxville, May 13, 2010), *no. Tenn. R. App. P. 11 application filed.* The Court in *Rickett* ultimately concluded that the error by the trial court was harmless. *Id.* at *29. This case is distinguishable from the one presently before us in that the Defendant

objected during the trial to the trial court's response and had not waived the issue by failing to include it in his motion for new trial. Our review, therefore, was predicated solely upon whether the trial court had erred and did not depend upon our finding that the trial court breached a "unequivocal rule of law." Further, our Supreme Court has previously noted that it could find no case that required a court of our state to provide the definition of "passion," concluding that "the word 'passion' is 'in common use and can be understood by people of ordinary intelligence.'" *State v. Mann*, 959 S.W.2d 503 (Tenn. 1997) (citing *State v. Raines*, 882 S.W.2d 376, 383) (Tenn. Crim. App. 1997)). Based upon these two cases, we have difficulty concluding that the trial court in the case under submission breached a clear and unequivocal rule of law by not providing the jury further instruction. This, however, becomes a moot point because we conclude that consideration of this issue is not necessary to do substantial justice, which is a requirement for a plain error review.

Consideration of the issue is not necessary to do substantial justice because a substantial right of the Defendant has not been adversely affected. This Court should only reverse the judgment of a trial court if the "'plain error' . . . [is] of such a great magnitude that it probably changed the outcome of the trial" and undermined the "fundamental fairness of the trial." *Adkisson*, 899 S.W.2d 642. When reviewing the evidence presented against the Defendant, it is clear that the trial court's failure to further define "state of passion" probably did not change the outcome of the trial. The evidence proved that the Defendant and the victim were at Virgil's trailer with Bailey and Slighton on the night before the murder. The Defendant was upset with the victim because the victim was attempting to take over his businesses of selling drugs and managing prostitutes. At some point that evening, Clardy went to purchase drugs from the Defendant on credit, and, while there, Bailey told her that something was getting ready to "go down." Clardy then heard an argument between the Defendant and the victim over drugs and prostitutes. Slighton testified that the Defendant and the victim engaged in a physical confrontation over the Defendant hitting her, she ran away, and stopped when she heard gunshots. Slighton said she turned around and saw the victim fall and the Defendant point a gun at the victim. She then heard another gunshot and ran away again. Clardy and Armour both saw the Defendant shoot the victim. This evidence overwhelmingly supports the jury's convicting the Defendant of second degree murder, and substantial justice does not mandate our plain error review. The Defendant is not entitled to relief.

## III. Conclusion

After a thorough review of the record and the applicable authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE