**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**DECEMBER SESSION, 1996**

FILED

April 24, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 03C01-9507-CC-00203** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **SULLIVAN COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. R. JERRY BECK** |
| **NATHAN ALLEN CALLAHAN,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (First Degree Murder) |

**ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF SULLIVAN COUNTY**


FOR THE APPELLANT:

STEPHEN M. WALLACE
District Public Defender

FOR THE APPELLEE:

CHARLES W. BURSON
Attorney General and Reporter

DARIAN B. TAYLOR
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

H. GREELEY WELLS
District Attorney General

NANCY S. HARR
Assistant District Attorney General
Blountville, TN 37617


OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

This is an appeal as of right pursuant to Rule 3, Tennessee Rules of Appellate Procedure. The Defendant, Nathan Allen Callahan, was convicted by a Sullivan County jury of one count of first-degree murder and one count of second-degree murder, respectively, for the shooting deaths of his mother and younger sister. The jury set punishment for the first-degree murder conviction at life imprisonment and fined the Defendant $47,000.00 for the count of second-degree murder. The trial court ordered twenty-two years imprisonment on the conviction for second-degree murder to be served concurrently with the life sentence. The Defendant appeals his convictions and raises the following issues: (1) That the evidence is insufficient to support the conviction for murder in the first degree; (2) that the trial court erred in denying the Defendant's special jury request; (3) that the trial court erred in failing to suppress his confession; and (4) that the trial court erred by not suspending the fine imposed by the jury. After careful review of the issues and the record, we affirm the judgment of the trial court.

On March 30, 1994, Gale Callahan and her thirteen-year-old daughter, Holly, were shot to death in the garage of their home. At the time of the murders, the Defendant had just turned fifteen. He lived with his parents, Gale and Glen Callahan, and his younger sister, Holly, in a suburban neighborhood in the Indian Hills community of Sullivan County. At around age fourteen, the Defendant's behavior had changed; he had new friends, his grades began to drop, he stopped doing homework, and he started skipping classes. In the fall of 1993, after

becoming suspicious that his son might be using drugs, Glen Callahan installed a recorder to tape his son's telephone calls.  On New Year's Eve, 1993, Mr. Callahan recorded the Defendant talking with a friend about using marijuana.  He also talked about sneaking out of the house and driving the new Trans-Am Pontiac his grandfather had bought for him.   Mr. Callahan confronted the Defendant, who denied that this  was true and refused to reveal his drug source. Mr. Callahan became enraged and smashed the Defendant's electric guitar, another gift from his grandfather.

Mr. Callahan stayed that night with the Defendant who lived in the downstairs area of the house, fearful of how he might react.  The next morning, the Defendant went into the bathroom to take a shower, but actually crawled out the window.  After discovering he was missing, his parents searched for him and later found him lying under the basement steps.   Mr. Callahan sold the Defendant's car, took him for random drug tests, and became very restrictive of his activities and his access to money.  He had an outpatient mental health evaluation in January which revealed no significant mental disturbance, but did indicate substance abuse.   The recommended treatment was outpatient counseling, with more extensive treatment possible if the drug screens continued to appear positive.  Subsequent drug screens continued to test positive for marijuana and the Defendant's parents monitored his activities at school.  They bought a new  black Chevrolet Camaro and promised the Defendant a learner's permit to drive if two drugs screens came back negative.  The car keys were kept locked up.

The situation remained somewhat the same during the month before the murders. Mr. Callahan noted at trial that the Defendant rarely expressed emotion and that he had never seen him cry. The Defendant never expressed anger, even after his guitar was smashed, his car was sold, and he was restricted. However, two days before the killings, the Defendant asked his sister, in the presence of her friend, "what would you do if I killed my Mom and Dad?" His sister Holly replied: "Nathan, shut up. That's not nice to say. You shouldn't do that, I would hate you forever if you did."

On the day of the murders, the Defendant had lengthy telephone conversations with two of his friends. He initiated a discussion about whether he should kill his parents. Unbeknownst to the Defendant, these telephone calls were tape-recorded. They revealed the animosity he harbored toward his family and the planning and execution of the murders. The Defendant devised the plan to kill his mother and sister after they returned home from a shopping trip. His father was away on a business trip and was expected to be back later that evening. The Defendant retrieved a 20 gauge shotgun, a present from his grandfather that was stored under his parents bed. He located a box of ammunition, loaded the chamber with four shells and placed the gun outside behind a fence near the garage. During this time, the Defendant remained in phone contact with James Saylor, who participated actively and made suggestions.

When the Defendant saw that his mother and sister had returned, he set the telephone down, still off the hook, and went outside. He picked up the shotgun and hid behind his Camaro, that was parked in the driveway. His mother

and sister opened the garage door and walked inside toward a door leading into the house. As they neared the door, the Defendant walked into the garage. His sister, Holly, turned around and he shot her in the lower front. He then shot his mother in the shoulder. He walked within a few feet of his sister and shot her in the head, then reloaded the gun and shot his mother in the buttocks, in her back, and in her head. The brains of both victims were blown from their heads.

The Defendant left the garage and picked up the telephone, telling James Saylor that he had killed his mother and sister. He took money and his mother's cellular phone and put the shotgun and a box of shells in the Camaro. Saylor became concerned and told his mother, Terrell Saylor, what the Defendant had done. Terrell Saylor called the Defendant, then allowed her son James to talk with him while still listening on the line. The Defendant again stated that he had killed his mother and sister. Fearful that he would come to their home, Terrell Saylor called 911 and reported the incident. The Defendant left the house, driving the black Camaro.

Members of the Sullivan County Sheriff's Department were dispatched to the Callahan residence. Noticing that the garage door was open, the officers went inside and discovered the bodies of Gale and Holly Callahan. The officers also did a protective sweep of the home, noticing a number of bloody footprints both in the garage and in some areas of the house. Lieutenant Reece Christian arrived on the scene to investigate. A number of shell casings were observed in the garage. Gale Callahan's purse was lying in a laundry basket, where the Defendant had left it after taking some cash.

Meanwhile, the Defendant drove to the Fort Henry Mall to look for Jonathan Mann, another friend. He approached Andrew Carter, a school classmate, in a video arcade and announced that he had just killed his mother and sister. The Defendant pulled the car keys out of his pocket and asked "you believe me now?" The Defendant also stated that he needed to find somewhere to hide. He left the mall and went to a convenience store, the Greenwood Market. While he was using the pay phone, someone at the market called 911 and reported his presence. He then left and drove to the B&C Market, another convenience store. Charles Addison, a local resident, saw the Defendant at the Greenwood Market and followed him to the B&C. He observed the Defendant on the pay phone. Mr. Addison then reported the Defendant's whereabouts. Soon thereafter, Lieutenant Christian and two other officers arrested him at the B&C Market. The officers saw a shotgun and a box of shells through the hatchback window. The Defendant was transported to the Sheriff's Department.

There, Glen Callahan, who had returned from his business trip, gave permission to question the Defendant. After being advised of his rights, the Defendant gave a lengthy confession. Lieutenant Christian wrote out the statement as the Defendant made the oral confession. The Defendant reviewed and signed the document. A urine drug screen was conducted and the results were negative. The Defendant was housed in the Upper East Tennessee Regional Juvenile Detention Center until he was transferred to the Lakeshore Mental Institute for an evaluation. He was determined to be competent to stand trial. He was returned to the Detention Center. On July 7, 1994, the Defendant was transferred to the Sullivan County Criminal Court for prosecution as an adult.

The Defendant was indicted on two counts of first-degree murder for the shotgun deaths of Gale and Holly Callahan. He was transferred to the Sullivan County Jail, a secure facility, and was housed separately from the adult population. The Defendant was tried on March 13-17, 1995, and was convicted on a jury verdict of one count of first-degree murder and one count of second-degree murder. The jury imposed a sentence of life imprisonment for the first-degree murder and a $47,000.00 fine for the second-degree murder. A sentencing hearing was held on March 18, 1995, after which the trial judge imposed a sentence of twenty-two years for the charge of second-degree murder to be served concurrently with the life sentence. The Defendant contests his convictions and the fine set by the jury.

I. Sufficiency of the Evidence

In his first issue, the Defendant argues that the evidence was insufficient to support the verdict of murder in the first degree for the death of Gale Callahan. He contends that the State failed to prove the element of deliberation because he was in an emotional state when the killings occurred.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754

-7-

S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

The Defendant claims that the evidence was insufficient to prove deliberation as required for first-degree murder. The trial judge instructed the jury under Tennessee Code Annotated section 39-13-202(a)(1), which states, "(a) First degree murder is: (1) An intentional, premeditated and deliberate killing of another...." Tenn. Code Ann. § 39-13-202(a)(1) (1991). A " '[p]remeditated act' means one done after the exercise of reflection and judgment. Premeditation may include instances of homicide committed by poison or by lying in wait." Tenn.Code Ann. § 39-13-201(b)(2) (1991). A "'[d]eliberate act' means one performed with a cool purpose." Tenn. Code Ann. § 39-13-201(b)(1) (1991).

The Tennessee Supreme Court has addressed the issues of premeditation and deliberation in State v. Brown, 836 S.W.2d 530 (Tenn. 1992), and in State

v. West, 844 S.W.2d 144 (Tenn.1992). In Brown, the court emphasized that deliberation and premeditation are two separate elements of first-degree murder. Deliberation, the court said, "requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.' " Brown, 836 S.W.2d at 540. Thus, deliberation requires "the formation of a cool, dispassionate intent to kill." West, 844 S.W.2d at 147. Premeditation does not require a specific amount of time to pass between the formation of the idea and the act. Brown, 836 S.W.2d at 540. However, the intent necessary to commit first-degree murder may not be formed in an instant because of the additional requirement of deliberation. Id. at 543. The court also noted that repeated blows or shots, alone, were not enough to prove first-degree murder. Id.; see also State v. Darnell, 905 S.W.2d 953, 961-62 (Tenn. Crim. App. 1995).

The Defendant contends that the act of shooting his mother was not free from passion such that the deliberation was formed to support his conviction. "Passion" has been defined as "any of the human emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection." State v. Tune, 872 S.W.2d 922, 926 (Tenn. Crim. App. 1993) (quoting State v. Bullington, 532 S.W.2d 556, 560 (Tenn. 1976)). Yet, the presence of agitation or anger does not necessarily preclude a finding that the act was performed with the necessary deliberation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

The Defendant points to the tape recording of his telephone conversations just prior to the murders. He asserts that his demeanor demonstrates that he was not free from the passion of the moment. The tape recording was played for

the jury at trial. The Defendant's father and grandfather testified that the tape recorded conversation did not sound like his normal voice and that he sounded agitated. The Defendant highlights excerpts of the tape in which he forms the intent to kill. However, he claims that it was done in an excited state fueled by his friend, James Saylor's encouragement. The Defendant does make some statements such as "Ah shit, I'm going to be so goddamn nervous trying to drive (after he murders the victims)" and that it would be "damn fun" or that "[s]on of a bitch, I'm going to try it. You want me to call you back?" At a later point in the conversation, they discuss Saylor coming over to the Defendant's house after he does the killings, yet Saylor conditions it by saying "I thought you were going to do that first" and "if you'll do it, I'll come over." The Defendant voices some agitation by saying "I can't believe what the fuck we're doing." He asserts that the anxiety he was experiencing just prior to the murders had not subsided such that he was free from passion.

Yet, there is evidence that the Defendant coolly calculated a plan, that he implemented the plan, and that he considered the consequences before he acted. In his confession, he admitted to thinking about killing his parents two weeks before the murders and he talked to others about killing his parents two days before the murders. In his confession, he states:

> I told my sister that I was thinking about killing our parents to see what Holly thought about it. Holly did not believe me and told me not to do it. She did not think I was serious but I was definitely serious about killing my parents. . . . [I] called Jonathan at his home and talked with him. We talked about killing my sister and my mother and he did not believe me. I told him I did not like the way my sister and my mother were treating me. . . . I have been thinking about killing my father, mother and sister for about 2 weeks. Because they would never let me go out and do anything with my friends.

From the recorded telephone conversations, the Defendant considered that if he killed his family "we're going to need some place to stay." Also, he plans the event: "They just went out to eat. Why don't you come over. I'm going to shoot them as soon as they walk in the door. Come up behind them, and shoot them in the garage so I don't get blood all over the house." "You know where my car is at, out back there, I've got the gun laying down there." When the Defendant hears that two other boys are at Saylor's house he asks: "Does he know what I'm going to do? Hey, you better not tell them, just in case." He states that "if I get caught. I'll go to jail. . . . If I get pulled over, I'm gonna have to shoot the goddamn cop. I can't outrun his fuckin' ass 'cause they'll have roadblocks. . . . I could get myself in a shit load of trouble right now. How many years do you think I'd get? Life?" "We're going to pawn all my Mom's jewelry out of state." Finally, when Saylor suggests giving the Defendant's mother Valium in her food, the Defendant responds:

> Defendant: No, I'm shooting her ass, bitch.
> Saylor: Poison her. That would be the best way.
> Defendant: I have to kill her, bitch, what if she wakes up, what the fuck am I gonna say?
> Saylor: She ain't gonna wake up if you poison her right.
> Defendant: I want to leave tonight, you sorry bitch. I'm gonna shoot her, shut the fuck up, I'm shooting her.

Dr. Nancy Lanthorn, a clinical psychologist, testified for the Defendant. She had evaluated him and listened to the audio tape of the telephone conversations. She concluded that the Defendant was socially and emotionally immature. She related that his cognitive development had not reached a point where he could effectively evaluate and assess the consequences of his actions to support a finding that he deliberated about the killings. Essentially, she stated

that "he was not reflecting. He was not planning realistically at that time" (before the killings).

The State presented Dr. Kevin Blanton in rebuttal, who evaluated the Defendant at Lakeshore Mental Health Institute and had listened to the audio tape. He concluded that the Defendant had enough maturity in his ego development to empathize with others, or to consider future actions, or to take responsibility for behavior." He opined that the Defendant had weighed matters, planned the killings and reflected upon the consequences such that he was able to deliberate prior to the act. Although admitting that the Defendant sounded anxious and nervous or nervous and elated, he asserted that the Defendant's speech did not suggest that he was consumed by emotion. Dr. Kris Houser, a psychiatrist, also testified that the Defendant appeared to have considered the "wisdom of his decision to kill" and that he considered the possible negative consequences. Dr. Houser stated that the Defendant was not anxious and nervous such that his judgment was clouded.

After a careful evaluation of the record, we conclude that the evidence was sufficient to support a conviction for first-degree murder for the death of Gale Callahan. It appears that the jury could have found beyond a reasonable doubt that the Defendant possessed the ability to deliberate about his plan to murder his mother and that he weighed the consequences of his actions. Although he may have been anxious or elated about perpetrating this crime, this does not necessarily mean that his emotions clouded his ability to deliberate. A "cool purpose" is not synonymous with a complete absence of emotion. It merely requires that the act be done without passion or provocation and free from the

influence of excitement.  See State v. Farmer, 927 S.W.2d 582, 589 (Tenn. Crim. App. 1996).  Here, in a lengthy confession, the Defendant admitted to thinking about killing his parents two weeks before the murders. He talked about murdering his parents two days before the killings.   He talked with a friend on the telephone while he planned and implemented the murders.  He shot his mother and sister from behind, without warning and without provocation in such a manner as to insure their deaths.

There is no merit to this issue.

II.

In his second issue, the Defendant contends that the trial court erred by denying his special request for a jury instruction.   At trial, the Defendant requested that the trial judge charge the jury the following from State v. Brown, 836 S.W.2d 530 (Tenn. 1992).

> The fact that repeated shots were inflicted upon the victim is not sufficient, by itself, to establish first-degree murder. Repeated shots can be delivered with no design or reflection. Only if such shots are inflicted as the result of premeditation or deliberation can they be said to prove first-degree murder.

Id. at 541.  The trial court denied the request on the ground that the instruction would amount to an improper comment on the evidence because it suggests that premeditation or deliberation could be inferred from repeated shots. Without the instruction, the jury would decide whether repeated shots would support a finding of first-degree murder.

The Defendant claims, however, that the State emphasized the fact that repeated shots were fired through testimony by the medical examiner regarding the wounds on the victims and the number of shotgun shells found at the scene. He argues that the omission of the special jury instruction deprived him of having every issue of fact submitted to the jury with proper instructions.

A defendant is entitled to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). A trial judge should properly instruct the jury on the law governing issues raised by the evidence introduced at trial. State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App.1987). If a trial judge gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction. State v. Bohanan, 745 S.W.2d 892, 897 (Tenn.Crim.App.1987). Upon reviewing the entire charge we may only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn.1987).

Special instructions should be given if "fundamental" to the case. Where the charge is one that is "fundamental in nature" and "essential to a fair trial," failure to give the charge may result in error. State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994); Teel, 793 S.W.2d at 249; Souey v. State, 81 Tenn. (13 Lea) 472, 480 (1884).

Here, the trial court gave instructions to the jury in accordance with the Tennessee Pattern Jury Instructions for first-degree murder as well as the holdings in Brown and West. See State v. Brown, 836 S.W.2d 530 (Tenn. 1992);

-14-

State v. West, 844 S.W.2d 144 (Tenn.1992); T.P.I.-Crim. 7.01 (3d. ed.). This included sections defining the elements of the crime and both premeditation and deliberation. This was a complete instruction on the law of first-degree murder as to the required elements to prove the crime beyond a reasonable doubt. Considering the facts in this case, the instruction that was given was sufficient.

A special instruction must be fundamental to the case before the failure to issue it becomes error. Unlike Brown, repeated shots were not integral to proving the case at bar. In Brown, the Defendant beat his three-year-old son to death. Brown, 836 S.W.2d at 534. In order to support a conviction for first-degree murder, the State relied solely on circumstantial evidence that the victim had received repeated blows. Id. at 543. Our supreme court held that "repeated blows" alone could not support a conviction. The proof in this case, however, does not rely on the fact that the Defendant inflicted repeated shots. There was ample evidence through his confession, the taped telephone calls, and the testimony of witnesses that would sustain a finding that the killings were premeditated and deliberate. The necessity of a special instruction must be determined by "the nature of the proceedings and the evidence introduced during trial." Teel, 793 S.W.2d at 249; see McAfee, 737 S.W.2d at 308. Thus, the issue of repeated shots was not fundamental to the proof of this case.

We cannot conclude that the failure of the trial judge to issue the special jury instructions prevented the Defendant from receiving a fair trial. We also agree that the evidence of repeated shots was an issue of fact and that any inference drawn therefrom, whether it supported or hindered the defense, was properly left to the jury to decide.

This issue has no merit.

III.

In his third issue, the Defendant claims that the trial court erred in admitting his confession on two grounds: (1) That the failure of Sheriff's Department detectives to inform him that he could be tried as an adult rendered his confession involuntary; and (2) that the confession should have been suppressed because it was not recorded on audio tape.

The Defendant asserts that his waiver of his right to remain silent was involuntary and violative of the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. The Fifth Amendment to the Constitution as applied to the States through the Fourteenth Amendment insures that the accused may not be compelled to be a witness against himself. The Tennessee Constitution also provides that a defendant cannot be compelled to give evidence against himself. Tenn. Const. art. I, § 9. The accused may waive these rights, but the waiver must be made "voluntarily, knowingly, and intelligently" and "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." Miranda v. Arizona, 384 U.S. 436, 444, 467, 86 S.Ct. 1602, 1612, 1624, 16 L.Ed.2d 694, 706, 719 (1966).

The voluntariness test under the Tennessee Constitution is more protective of individual rights than the test under the Fifth Amendment. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994); see State v. Crump, 834

S.W.2d 265, 268 (Tenn. 1992); State v. Smith, 834 S.W.2d 915 (Tenn. 1992). A waiver is valid if the suspect is aware of the nature of the right being abandoned and the consequences of the decision to abandon the right. Id. at 547. In assessing whether a waiver of a right was voluntary, we must look at the totality of the circumstances surrounding the relinquishment of the right. State v. Benton, 759 S.W.2d 427, 431-32 (Tenn. Crim. App. 1988).

After the Defendant was arrested, he was transported to the Sullivan County Sheriff's Department and was placed in an interview room. This was at approximately 9:30 p.m. Glen Callahan arrived at the Sheriff's Department and gave his permission for Lieutenants Christian and Boyd to interview the Defendant. Christian presented the Defendant with a standard rights form containing the Miranda warnings and read it to him. The Defendant also read the form himself and stated that he understood it. Christian asked the Defendant whether he was willing to talk, and he indicated his assent. Christian then read a waiver of rights form, which the Defendant signed. He then made a statement. He was calm and polite. During this time, Lieutenant Christian wrote out, verbatim, the Defendant's statement. The Defendant reviewed the statement, initialed any changes, and signed it. The statement chronicled the events leading up to, during, and after the killings, resulting in a thirteen-page confession.

The Defendant does not contend that he was coerced into giving a confession, but claims that his age and the fact that he was not informed that he could be prosecuted as an adult precluded him from making a knowing and intelligent waiver. He asserts that he is potentially exposed to two differing ranges of punishment as a juvenile and as an adult.

-17-

The totality of the circumstances approach has been applied to the custodial interrogation of juveniles. See Fare v. Michael C., 442 U.S. 705, 99 S.Ct. 2572, 61 L.Ed.2d 197 (1979). This includes assessing "the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." 442 U.S. at 725, 99 S.Ct at 2572. However, "[t]he (United States) Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver." Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987); see also Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The primary protection afforded by the Miranda warnings are to prevent coerced self-incrimination and "relevant defendant ignorance." Stephenson, 878 S.W.2d at 547.

Our examination of the totality of the circumstances surrounding the statement made by the Defendant indicates that the relinquishment of his rights was not the product of intimidation, coercion, or deception, but that it was the result of the appellant's free and deliberate choice. The Defendant was given Miranda warnings and read them. He read and signed the waiver as well. His demeanor was calm and cooperative. He was given something to drink and to eat. Although he was of a young age, the Defendant has above-average intelligence and indicated no reason why he could not comprehend what rights he was relinquishing.

As for not informing him that he could be tried as an adult, there is no constitutional requirement that mandates such information be provided to secure

a knowing waiver. <u>Miranda</u> warnings inform a defendant that "anything you say can be used against you in court." This applies to any court. Furthermore, the ultimate decision to try the Defendant as an adult was not made until after he was questioned and gave his statement. It would have been premature and inappropriate for the detectives to outline all the legal consequences of a relinquishment of rights.

Deference is given to the trial court to assess the credibility of the witnesses and determine issues of fact. At an evidentiary hearing on a motion to suppress evidence, the trial court's findings of fact are conclusive. <u>State v. Jackson</u>, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993). The findings of the trial judge are afforded the weight of a jury verdict and will not be disturbed on appeal unless the evidence in the record preponderates against the judgment of the trial court. <u>Id.</u>; <u>see</u> <u>State v. Kelly</u>, 603 S.W.2d 726, 728-29 (Tenn.1980). <u>State v. Killebrew</u>, 760 S.W.2d 228, 233 (Tenn. Crim. App. 1988); The evidence in the record does not preponderate against the trial court's findings. This issue is without merit.

The Defendant also asserts that his confession should have been suppressed because it was not tape-recorded. He readily admits that there is no precedent in this state requiring confessions to be recorded. He argues that the law should be changed. He cites opinions from two state supreme courts that have instituted a policy that confessions must be tape recorded if at all possible. <u>State v. Scales</u>, 518 N.W.2d 587 (Minn. 1994); <u>Stephan v. State</u>, 711 P.2d 1156 (Alaska 1985).

In Stephan, the court ruled that custodial interrogations in a place of detention must be electronically recorded. 711 P.2d at 1162. This holding was based entirely on that court's interpretation of the Alaska Constitution. Id. at 1160. The Minnesota Supreme Court exercised its supervisory power to institute a recording requirement for custodial interrogations. Scales, 518 N.W.2d 592. Although we agree that it is preferable to record electronically the reading of Miranda warnings, the waiver of rights, and custodial interrogations, we decline to impose this as a requirement for admissability of statements. It inures to the benefit of law enforcement to record the processes by which it garners confessions by showing that the procedures were done properly and without coercion. It is rather curious that the detectives in this case chose to write out the Defendant's statement in longhand. Yet, neither the federal nor state constitutions mandate the use of recording devices. Therefore, we find that the trial court properly admitted the Defendant's written statement. This issue has no merit.

IV.

As his fourth and final issue, the Defendant claims that the trial court erred in declining to waive the $47,000 fine assessed by the jury on the count of second-degree murder. The imposition of fines is guided by the 1989 Sentencing Act. Second-degree murder is a Class A felony for which the jury may impose a fine not to exceed fifty thousand dollars ($50,000). Tenn. Code Ann. §§ 39-13-210(b), 40-35-111(b)(1). Furthermore, the punishment should be justly deserved in relation to the seriousness of the offense. Tenn. Code Ann. § 40-35-102(1).

The Defendant asserts that because he is indigent and the fine would pose an economic hardship, the trial court should have waived the fine. He cites State v. Bryant, 805 S.W.2d 762 (Tenn. 1991) which approved of the appellate review of fines. He also notes that the court upheld this Court's vacating a fine imposed on an indigent woman who worked as a waitress and newspaper delivery person. She also was convicted for selling cocaine and was fined $200,000. State v. Brenda G. Bryant, C.C.A. No. 872, Sullivan County (Tenn. Crim. App., Knoxville, Dec. 27, 1989), perm. to appeal granted (Tenn. 1990). The Defendant contends that he is indigent, will likely spend twenty-five years in prison, was in high school and has no employment record. Yet, proof of indigency and hardship does not necessarily preclude the punishment of a fine. See State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993). If, however, it hampers a defendant's rehabilitation, a fine may represent an unreasonable punishment. Id.

Here, the Defendant is clearly underage, indigent and has not developed job skills. There is evidence, though, that he has support from his family that has not abated even after this calculated and tragic crime. We do not feel that the imposition of the fine in this case is such that it contravenes the purpose of the Sentencing Act; rather it reflects the seriousness of the crime for which the Defendant was convicted. We find no error.

After thoroughly reviewing the record and the Defendant's arguments in this appeal, we conclude that none have merit. Accordingly, we affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE


CONCUR:



_____
DAVID G. HAYES, JUDGE


_____
THOMAS T. WOODALL, JUDGE