IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY 1999 SESSION


FILED

September 10, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9809-CR-00358 |
| | ) | |
| vs. | ) | Davidson County |
| | ) | |
| JAMES E. JACKSON, | ) | Hon. Steve Dozier, Judge |
| | ) | |
| Appellant. | ) | |
| | ) | (First Degree Murder) |

FOR THE APPELLANT:
MARTIN G. SZEIGIS
Attorney at Law
213 Third Ave. North
Nashville, TN  37201

FOR THE APPELLEE:
PAUL G. SUMMERS
Attorney General & Reporter

KIM R. HELPER
Asst. Attorney General
425 Fifth Ave. North
2d Floor, Cordell Hull Bldg.
Nashville, TN  37243-0493

VICTOR S. JOHNSON, III
District Attorney General

JON SEABORG
BERNIE McEVOY
Asst. District Attorneys General
Washington Square, Ste. 500
222 Second Ave. North
Nashville, TN  37201

OPINION FILED:_____


AFFIRMED

JAMES CURWOOD WITT, JR., JUDGE

## OPINION

The defendant, James E. Jackson, was convicted in the Davidson County Criminal Court of the first degree murder of Michael Kennedy. He is presently serving a life sentence in the Department of Correction for his crime. In this direct appeal, Jackson claims that the evidence is legally insufficient to sustain his conviction. Upon review of the record, the briefs and oral arguments of the parties, and the law, we affirm.

The state's evidence at trial established that prior to August 18, 1997, the defendant agreed to purchase a motorcycle from the victim. By August 18, 1997, the defendant had paid the victim a portion of the purchase price, and the victim was anxious to receive the balance owed. Sometime shortly before August 18, the defendant's brother wrecked the motorcycle, and this apparently contributed to the victim's anxiety over receiving payment.

During the late afternoon to early evening hours of August 18, 1997, David Sanders was sitting on the common porch in front of his and the defendant's apartments in a Nashville housing project. The victim approached Sanders and inquired whether Sanders had seen the defendant. Sanders responded that he had. The victim went into his apartment across a common area and returned a few seconds later. By this time, Sanders' girlfriend, Louise Horton, was also outside on the porch. The victim told Sanders that the defendant had caused the victim to have an argument with his girlfriend over a note the victim left for the defendant. The victim explained that the defendant was supposed to have paid him some money the previous Friday, and the victim left a note which said he wanted to see the defendant when the defendant got home. The victim proceeded to knock on and lightly kick the Jacksons' front door. Sanders did not think the victim was agitated.

When there was no answer at the door, the victim turned around and started back to his apartment; however, the defendant opened the door and called to the victim. The two men began discussing a note the victim left on the defendant's door and the motorcycle debt. The victim explained that he left the note because the defendant had failed to pay him on Friday, and he wanted to see the defendant about this failure to honor the obligation. The victim expressed his displeasure that the defendant had lied to him about the whereabouts of the motorcycle after the defendant's brother wrecked it. The defendant offered to pay the victim $50, which the victim declined because their agreement had been otherwise. The defendant asked the victim to come inside his apartment to discuss the situation, and the victim said there was no reason to come inside the defendant's apartment unless the defendant had the money. Sanders heard the victim say, "You ain't nothing but a big liar. I ought to take it out on your a--." The victim then said it would not be "worth it" and then proposed to "take it out" on the defendant's car, but he commented that this would not be "worth it," either. According to Sanders, during this entire exchange the victim was standing still on a step by the sidewalk or the porch.[1]

The defendant asked Sanders whether there was anyone with the victim, and neither Sanders nor Horton responded.[2] The victim commented that the defendant would need a favor from him sometime, and "f--- it." The victim turned toward his apartment and began walking away. The defendant opened the door, ran outside and said, "Hey, Mike." The victim turned around, and the defendant shot him in the leg. The victim fell, and the defendant continued shooting him. The

[1]Sanders placed the victim on a step with one foot on the porch, while Horton placed the victim on a sidewalk with one foot on a step below the porch.

[2]Sanders testified in this respect. However, Horton testified that the defendant did not ask whether the victim was alone until the victim was turning to leave.

3

defendant ran off, but he returned within fifteen to twenty seconds and said to the people who were assembling, "Y'all, n------, get out of the way, I'm fixing to kill this n-----."[3] Sanders told the defendant he was not going to shoot the victim again, and the defendant ran away.

Both Sanders and Horton denied seeing the victim with a gun during the confrontation. Sanders estimated that the entire incident took fifteen to twenty minutes, while Horton estimated the time at five minutes. Sanders denied that the victim was upset initially; however, he acknowledged that the victim became upset. Horton denied that the victim appeared angry or threatening. Horton commented on the victim's slight stature and found it incredible that the victim could evoke feelings of fear or intimidation. She indicated the victim was so small that had she been required to do so, she would have been able to "whoop him." Horton denied that there had been lasting tension between herself and the Jacksons over a recent incident in which the Jackson children got Horton's new hairstyle wet with their sprinkler.

Doctor John Gerber, the state's forensic pathologist, testified that the victim had ten gunshot wounds to his body, which included two grazing wounds. Two wounds to the victim's chest and abdomen were the most precipitous in causing death. Dr. Gerber could not determine the sequence or timing of the shots.

Officers Charles Blackwood, Jr. and Randall Papdinec, both of the Metro Police Department, testified that no weapon was found at the scene. Officer Blackwood, who worked with the Identification Section, conceded that a handgun could have fit into the victim's pants pockets. Blackwood also testified that marks

_____

[3]Sanders testified in this respect. Horton recalled the statement as "Y'all m-----f------, I am going to kill this m-----f-----."

**4**

in the pavement at the scene were consistent with the defendant standing over the victim and firing at him. Blackwood conceded, however, that he did not arrive at the scene until after the victim had been removed.

Not surprisingly, the defendant offered a somewhat different factual premise in his case-in-chief. On the morning of August 18, the defendant and his wife discovered a note on their front door which read, "James, I'm going to bust your a-- wide open as soon as I see you." This concerned the Jacksons. After the Jacksons dropped their children off at school and visited the defendant's employer, the defendant went to the victim's apartment and discussed the note with the victim's girlfriend. Carolyn Jackson, the defendant's wife, testified that the defendant was scared and upset when he returned from this encounter. The Jacksons went to the grocery store together. When they returned around 9:30 a.m., they found a second note on their front door. This note read, "The next time you come to my house, n-----, you better have my m-----f------ money. Yeah, it's my writing and I'm gonna sign it on your a--." Both notes were offered as evidentiary exhibits by the defense.

The Jacksons left their apartment early that afternoon to pick up their children at school, and they visited both of their mothers. During the day, they discussed the notes, with Mrs. Jackson urging that they go to the police. The defendant did not want to go to the police because he thought their involvement would exacerbate the situation. Although Mrs. Jackson planned to talk to the resident manager at the housing project about the notes, it is not clear whether she actually did so that day. Both of the Jacksons were afraid and anxious over the situation.

The Jacksons returned home around 6:00 p.m. They changed into

their bedclothes and started cooking dinner. About fifteen minutes later, they heard loud banging at the front door. Mrs. Jackson opened the door, and the victim told her to tell the defendant to bring his "m----f---- a--" outside. The victim also announced his intent to "bust [the defendant's] a--."[4] The victim was mad and paced back and forth in front of the house, which he continued to do throughout the confrontation.

Mrs. Jackson closed the door. The defendant, who was afraid, reopened the door and began talking to the victim. The victim cursed the defendant and threatened that the defendant had better honor his debt. The defendant saw a .380 or nine millimeter pistol hanging half-way out of the victim's pocket.[5] The defendant offered the victim the $50 that he had, but the victim refused to accept less than the full amount owed. The defendant asked the victim to come inside to discuss the debt, but the victim refused. The defendant, who had no phone in his apartment, asked Horton to call the police, but she did not. The defendant thought that the victim was about to pull out the gun, and the victim kept trying to get the defendant to come outside, telling him that he could not stay inside forever. The defendant testified that the victim was going to kill him, and if he attempted to leave in his car, the victim would blow it up.[6]

During this heated exchange, Mrs. Jackson had hidden the couple's two young children in the pantry. She checked the back door as a possible escape

---

[4]In addition to the Jacksons' testimony, the defense presented that of a neighbor, Taleasa Bingham, who observed the angry victim kicking the Jacksons' door and telling Mrs. Jackson that he was going to "bust [the defendant's] a--."

[5]Mrs. Jackson testified she did not see a weapon. Taleasa Bingham testified that she saw the outline of a handgun in one of the victim's front pants pockets.

[6]It is not clear whether these were actual threats or merely the defendant's perceptions of the victim's intent.

route, but she saw someone standing outside. For this reason, she was afraid to go for help out the back door. Mrs. Jackson was about to run out the front door to summon help when the defendant reached into a closet in the living room and pulled out the nine millimeter automatic rifle that he had purchased approximately one month earlier. The defendant testified that the weapon was secured behind some boxes in the closet and that it took him six seconds to retrieve the weapon and go to the front door; his wife testified the weapon was "real deep" in the closet. The defendant testified that he was afraid the victim might mistake his wife and children for him and that he had not entertained any thoughts of shooting the victim prior to his family preparing to run out the front door. The defendant went out the front door ahead of his wife, and the victim was right in front of the screen door. The defendant denied that the victim was walking away or that he said anything to the victim. The defendant fired the rifle at the victim. Mrs. Jackson estimated that after she told the defendant she was going to go for help, it was about fifteen seconds until the defendant fired at the victim.

The defendant remembered little about the shooting itself and did not know at that time whether he had hit or killed the victim. He did not know how many shots he had fired until several days later when he spoke with his attorney. He testified he had never fired the rifle prior to August 18, 1997. The defendant acknowledged that he fled and then returned; however, he claimed his return was to check on his family, rather than to shoot the victim again. The defendant ultimately fled the scene and stayed hidden for nine days because he was afraid of retaliation from the victim's friends or family. After the defendant's family was able to arrange his surrender to the police and hire an attorney, he turned himself over to the authorities.

The defendant estimated the time of the entire encounter at fifteen to

twenty minutes; his wife's estimate was seven to ten minutes. Taleasa Bingham, a neighbor who testified for the defense, testified that she saw the victim kicking the Jacksons' door as she was walking to her apartment, and by the time she was in her living room, she heard shots.

It is against this factual backdrop that we are called upon to resolve the sufficiency of the evidence issue. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

**8**

The defendant was convicted of first degree murder, which is defined in pertinent part as "[a] premeditated and intentional killing of another . . . ." Tenn. Code Ann. § 39-13-202(a)(1) (1997). The first degree murder statute defines premeditation as

> an action done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement or passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997). "'Intentional' refers to a person who acts intentionally with respect . . . to a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302 (1997); see also Tenn. Code Ann. § 39-11-106(a)(18) (1997).

In Tennessee, a homicide, once established, is presumed to be second degree murder. See, e.g., State v. West, 844 S.W.2d 144, 147 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The state bears the burden of establishing premeditation in order to elevate the crime to first degree murder. See, e.g., West, 844 S.W.2d at 147; Brown, 836 S.W.2d at 543. With respect to premeditation, its existence may be inferred from the circumstances surrounding the crime. See, e.g., State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998), cert. denied, --- U.S. ---, 119 S. Ct. 2025 (1999).

Upon review of the facts in the light most favorable to the state, we conclude that the evidence sufficiently supports the defendant's conviction of premeditated and intentional first degree murder. The unarmed victim went to the defendant's house to discuss the defendant's debt. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998) (use of deadly weapon on unarmed victim), cert.

denied, --- U.S. ---, 119 S. Ct. 1359 (1999); State v. Bullington, 532 S.W.2d 556, 560 (Tenn. 1976) (past relationship between victim and defendant). Although the discussion was perhaps contentious and the victim indicated he would assault the defendant, the victim did not behave threateningly. The victim indicated he was abandoning hope of collecting the debt. Over the course of several seconds, the defendant reached into the depths of a closet, retrieved his automatic rifle, opened the front door, called, "Hey, Mike," to the victim, and shot the victim when he turned back. See Everett v. State, 528 S.W.2d 25, 28 (Tenn. 1975) (victim was fatally attacked when retreating from argument with defendant) (Brock and Henry, JJ., dissenting). The wounded victim fell to the ground, and the defendant continued to fire at him until the victim received ten gunshot wounds. See Brown, 836 S.W.2d at 542 (repeated shots or blows cannot alone establish premeditation but are properly considered along with other circumstances in assessing the existence of premeditation); e.g., State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992) (attempt to shoot victim again after he had been felled and rendered helpless); Bullington, 532 S.W.2d at 560 (repeated shots). The defendant ran away, but he returned and announced his intent to kill the victim. Cf. State v. Kendricks, 947 S.W.2d 875, 879-80 (Tenn. Crim. App. 1996) (defendant said "I told you so" to victim after shooting her), perm. app. denied (Tenn. 1997). When challenged by Sanders, the defendant fled and did not surrender to the authorities for nine days. See State v. Fugate, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988) (failure to render aid to the victim).

These facts lead us to the inescapable conclusion that a jury which accredited the state's proof could find beyond a reasonable doubt that the defendant committed intentional, premeditated murder. Accord State v. Ervin Lee Hayes, No. 01C01-9809-CR-00374 (Tenn. Crim. App., Nashville, July 9, 1999); State v. James Gayles, No. 03C01-9708-CR-00339 (Tenn. Crim. App., Knoxville,

**10**

July 6, 1999); <u>State v. Fred Delaney</u>, No. 02C01-9804-CR-00105 (Tenn. Crim. App., Jackson, June 3, 1999), <u>applic</u>. <u>for</u> <u>perm</u>. <u>app</u>. <u>filed</u> (Tenn. July 29, 1999). His conviction of first degree murder is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:


_____
JOSEPH M. TIPTON, JUDGE


_____
JOHN EVERETT WILLIAMS, JUDGE