IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2007

## STATE OF TENNESSEE v. MARQUETTE MILAN
**Appeal from the Criminal Court for Shelby County**
**No. 04-02746  W. Otis Higgs, Jr., Judge**

---

**No. W2006-01408-CCA-R3-CD  - Filed November 29, 2007**

---

The defendant was convicted by a Shelby County jury of first degree premeditated murder, first degree felony murder, and especially aggravated robbery, a Class A felony. The trial court merged the two murder convictions and sentenced the defendant to life in prison for first degree murder and twenty years for especially aggravated robbery, with the sentences to be served concurrently. On appeal, the defendant contends that the trial court erred in excluding the testimony of two witnesses, a forensic psychologist and the defendant's mother, who would have offered testimony regarding the defendant's ability to form the requisite culpable mental state. The defendant also contends that the evidence produced at trial was insufficient to support the jury's guilty verdicts. After reviewing the record, we conclude that the trial court did not abuse its discretion in excluding the testimony of the two witnesses, and that the evidence produced at trial was sufficient to support the defendant's convictions. Accordingly, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
### Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Charles S. Mitchell, Memphis Tennessee (on appeal); Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Marquette Milan.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Reginald Henderson and Dean Decandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At trial, Officer Michael Hill with the Memphis Police Department testified that on November 1, 2003, he investigated a murder that took place at a rooming house located at 997 South

Willet Avenue in Memphis. Upon arriving at the scene, Officer Hill found the male victim, later identified as Lannie McMillan, lying dead against the wall in the common living room of the house. Officer Hill observed that the victim had a head injury and the wall behind the victim's body was splattered with blood. Officer Hill observed several bullet holes in the walls, numerous spent bullet casings on the floor, and a knife on the floor near the victim's body. Officer Hill also observed that the rear door to the house had been knocked off its hinges, and the door to one of the boarding rooms located on the second floor had also been damaged.

Sergeant Anthony Mullins with the Memphis Police Department testified that he became the lead investigator on the McMillan case shortly after the shooting. He testified that a few days after the murder, he and members of the police department's gang task force transported the defendant, along with Jared Robinson, Cortez Griffin, and Preston Deener,[1] to a police station for questioning. Sergeant Mullins testified that the defendant initially stated that he was outside the residence the night of the shooting, and while he saw shots being fired, the defendant did not indicate that he participated in the shooting. Sergeant Mullins testified that the defendant was not arrested after the initial interview. Sergeant Mullins testified that he arrested the defendant on December 12, 2003, about a month after the initial interview. Sergeant Mullins testified that he advised the defendant of his rights, and although the defendant appeared "a little bit shaken" after being shown a note that had been written by Robinson, the defendant generally maintained his composure.

Sergeant Mullins testified that two days later, on December 14, he interviewed the defendant at Shelby County Juvenile Court. The defendant's mother was present during this interview. Sergeant Mullins told the defendant that he did not believe that the defendant was being honest with police. At that point, the defendant began to cry and told Sergeant Mullins that he wanted to tell the truth about McMillan's death. After signing a Miranda waiver, the defendant gave a statement, which was read into evidence at trial. The defendant told Sergeant Mullins that on the night of the shooting, he, Deener, and Griffin proceeded to the boarding house because they intended to rob McMillan, who they believed had recently purchased eight ounces of marijuana. The defendant stated that he and the other two men were ordered to carry out the crime as a gang task, and that the higher-level gang members had supplied him with a .380 pistol and Griffin with a 9 mm automatic Smith & Wesson handgun. After breaking into the house through a back door, the three men waited on an interior stairway for McMillan, who exited his room on the second floor and ran past the three men. After McMillan passed the three men, Griffin, who stood behind the defendant on the stairs, began firing at McMillan; the defendant, who claimed to be panicked by the gunfire, began shooting at McMillan as well. After the shooting ended, the defendant saw that the victim was dead. After that, the assailants left the boarding house, returning a short time later. After returning to the house, the defendant kicked in the victim's door, found the marijuana they had intended to steal, took the drugs, and exited the house.

---

[1]Griffin was originally indicted as a co-defendant on all three counts, and Deener was indicted as a co-defendant on the especially aggravated robbery count. The resolutions of their cases are unclear from the record.

On cross-examination, Sergeant Mullins stated that the defendant was sixteen years old on the day he made his statement to police. Sergeant Mullins stated that the defendant's mother had made the police aware of the defendant's possibly suffering from bipolar disorder and about a chemical imbalance that existed in his brain. Sergeant Mullins stated that although it did not appear in the defendant's statement, the defendant told police that if he did not carry out the ordered task, he could receive a "mouth shot," or a blow to the mouth with a fist or weapon. Sergeant Mullins stated that the defendant did not appear to be particularly articulate. On redirect, Sergeant Mullins testified that the defendant had stated that nobody had forced him to join the gang.

Dr. O.C. Smith testified that he performed the autopsy on McMillan. Dr. Smith testified that the victim died as the result of multiple gunshot wounds. Dr. Smith testified that he located eleven entrance wounds on the victim's body, including one to the head, although two of the wounds were caused by a bullet exiting the body and then re-entering in another location. Dr. Smith recovered five bullets from the victim's body and one from his clothing. Dr. Smith determined that the bullets were of two different types: two of the bullets were shorter, metal jacketed bullets consistent with a .380, and the other four bullets were longer, hollow point bullets consistent with a 9 mm.

Teri Arney, a firearms examiner with the Tennessee Bureau of Investigation, determined that two of the bullets recovered from the victim were .380 caliber fired from one gun and the other four were 9 mm fired from a second gun. She testified that she examined nineteen casings recovered from the scene; fourteen of the casings were from 9 mm bullets and five were from .380 bullets.

Prior to trial, the defendant filed a notice of his intent to introduce the testimony of a mental health expert, Dr. Joseph Angelillo, concerning the defendant's inability to form the culpable mental state due to a mental disease or defect. During trial, the trial court held a jury-out hearing to determine the admissibility of the expert's testimony. Dr. Angelillo, a licensed clinical psychologist who was accepted by the trial court as an expert in the field of forensic psychology, testified that he had been retained to evaluate the defendant. He testified that he reviewed the defendant's records and concurred with a 2001 report that diagnosed the defendant as having bipolar disorder. Dr. Angelillo described bipolar disorder as a "mood disorder" that "affect[s] one[']s ability to think in a clear, rational, goal directed way." The expert testified that he administered several tests to the defendant and determined that the defendant had an IQ of 61. The expert testified that the defendant knew right from wrong but had difficulty appreciating the consequences of his actions. On cross-examination, Dr. Angelillo agreed that his written report contained no discussion of the facts of the crime, and that his conclusions regarding the defendant's mental state were based on the earlier diagnosis of bipolar disorder. The trial court also questioned the expert regarding the defendant's ability to form the requisite mental state necessary to commit the offense, to which the expert replied that the defendant's "ability to contemplate and . . . to think, to meditate, to consider the consequences of his actions continues to be . . . and has been significantly impaired." At the close of the proffer, the trial court ruled that Dr. Angelillo's testimony was inadmissible, stating that the expert's testimony "[did] not satisfy the legal requirement for diminished capacity or a mental

disease or defect that would prevent [the defendant] from forming the intent to commit murder in the first degree."

The defendant also sought to introduce testimony by his mother, Betty Hackett, regarding his mental history and the effects of his prescribed psychotropic medications. During a jury-out hearing, Ms. Hackett testified that the defendant began taking psychotropic medication when he was eight years old. She said that her son had received inpatient mental health treatment at LeBonheur, Compass Intervention, and Lakeside Hospital, and he had also received extensive outpatient counseling through the University of Tennessee. Ms. Hackett testified that her son was not taking his prescribed medication at the time of the shootings. She stated that at the time her son was questioned by police, she informed the police that her son had suffered from a chemical imbalance, suffered from bipolar disorder, and that he was taking medication. She also testified that she may have told police that the defendant had been hospitalized in a medical institution. At the close of the proffer, the trial court ruled that because Ms. Hackett was not a medical expert, her testimony, which was offered to show that the defendant lacked the capacity to form the requisite mental state for the offenses, was inadmissible at trial.

The defendant testified at trial, with much of his testimony mirroring his December 14, 2003 statement to police. The defendant testified that he joined his gang, the Imperial Insane Vice Lords. when he was fifteen or sixteen years old, and that he joined the gang because he wanted to join it. The defendant testified that Robinson was the leader of the gang, with Luther Darnell on the next level of the hierarchy, Deener on a level below Darnell, and all other persons, including the defendant, on the lowest level of the gang. The defendant reiterated that he had been ordered to carry out the robbery by upper level gang members, and that his failure to follow commands would have resulted in a "mouth shot," or a blow to the mouth with a fist or a weapon. The defendant testified that Deener broke down the back door of the rooming house and that he, Deener, and Griffin entered the house with the sole intention of stealing the victim's marijuana. However, after the victim emerged from his room, Griffin began firing at the victim, and the defendant, who said he was panicked by the shooting, began firing at the defendant as well. After the shooting, the defendant kicked down the victim's bedroom door and took the marijuana located inside the victim's room.

Based on the above testimony, the jury found the defendant guilty on all counts of the indictment. The trial merged the two murder convictions and sentenced the defendant to life in prison on the first degree murder conviction and twenty years in prison on the especially aggravated armed robbery conviction, with that sentence to be served concurrently to the defendant's life sentence. This appeal follows.

EXCLUSION OF DEFENSE WITNESSES


The defendant contends that the trial court erred in refusing to allow testimony of an expert witness, Dr. Joseph Angelillo, and of the defendant's mother regarding the defendant's difficulty in forming the requisite mental state for the charged offenses. The defendant argues that the Dr. Angelillo was qualified as an expert in the field of forensic psychology, and that both his and the defendant's mother's testimony was relevant and should have been admitted. The state argues that because the defense expert did not conclusively state that the defendant was incapable of forming the requisite mental state, the trial court properly excluded the testimony pursuant to the Tennessee Supreme Court's holding in State v. Hall, 958 S.W.2d 679 (Tenn. 1997). The state also argues because the defendant's mother was not an expert, her testimony was also properly excluded under Hall. We agree with the state regarding both witnesses.


Our appellate courts have "concluded that a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that '[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt.'" Hall, 958 S.W.2d at 689 (internal citation omitted). Furthermore, "the negation of an element of a criminal offense is recognized as a defense in Tennessee." Id. (citation omitted). In Hall, our supreme court held that psychiatric evidence that the defendant lacked the capacity to form the requisite mental state for an offense

> must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite mental state to commit the offense charged is admissible under Tennessee law.

Id.; see also State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994) ("While the law presumes sanity it does not presume mens rea. Due process requires that the government prove every element of an offense beyond a reasonable doubt.").


Tennessee Rule of Evidence 401 broadly provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Regarding expert testimony, an expert may testify "in the form of an opinion or otherwise" when the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Tenn. R. Evid. 702. The expert's opinion must be supported by trustworthy facts or data

"of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002) (citations omitted). "[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court," and a trial court's ruling on the admissibility of such evidence "may only be overturned [on appeal] if the discretion is arbitrarily exercised or abused." McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-264 (Tenn. 1997).

The testimony of the defendant's mother regarding the defendant's mental state was properly excluded because she did not qualify as a mental health expert who was qualified to give psychiatric testimony as required by Hall, and her testimony was therefore not admissible. Regarding Dr. Angelillo, he was qualified as an expert in the field of forensic psychology, and his testimony was relevant to the defendant's ability to form the requisite culpable mental state. However, this court has concluded that "our supreme court specifically stated that the admissibility of an expert's testimony regarding a defendant's diminished capacity requires a showing (1) that the defendant 'lacked the capacity' to form the culpable mental state and (2) that he lacked the capacity due to a mental disease or defect." State v. Antonio D. Idellfonso-Diaz, No. M2006-00203-CCA-R9-CD, slip op. at 4 (Tenn. Crim. App. Nov. 1, 2006) (emphasis added), app. denied, (Tenn. Feb. 26, 2007). Dr. Angelillo testified that the defendant suffered from bipolar disorder, but when asked by the trial court whether the defendant was "incapable of forming the intent to commit murder in the first degree because of a mental disease or defect," the expert replied that the defendant "has had difficulty with forming intent as far as appropriate goal directed behavior." The holding in Hall requires that the defendant's mental disease or defect render the defendant unable to form the requisite mental state; evidence that the defendant's mental disease or defect "impaired or reduced" the defendant's ability to form the requisite mental state does not satisfy the Hall standard. See id., slip op. at 4-5. Accordingly, we conclude that the trial court did not abuse its discretion in excluding Dr. Angelillo's testimony.

## SUFFICIENCY OF EVIDENCE

The defendant contends that the evidence produced at trial was insufficient to support his convictions for first degree murder and especially aggravated robbery. We disagree.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571

S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The defendant was convicted of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The two murder convictions merged into a sole judgment of conviction for first degree murder. First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Our criminal code explains:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. §(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has noted that factors demonstrating the existence of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. Additional factors cited by this court from which a jury may infer premeditation include "planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." State v. Halake, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Furthermore, "[e]vidence that a defendant lay in wait for a victim is strong evidence of premeditation." Id. at 669 (citing State v. Bullington, 532 S.W.2d 556, 560) (Tenn. 1976)).

In this case, the defendant admitted to police and testified at trial that he and two other gang members went to the victim's residence. He and one other gang member were armed when they entered the house, and after entering, the three men waited inside the house to confront the victim. The two gunmen shot the victim numerous times before leaving, and a short time after leaving, the defendant returned to the house, broke into the victim's bedroom, and stole marijuana from the

-7-

room.  The jury's verdict indicates that it found that this evidence was sufficient to establish beyond a reasonable doubt that the defendant acted "intentionally and with premeditation" in killing the victim, and it is not within the province of this court to override those factual determinations.  We therefore conclude that the evidence was sufficient to support the defendant's first degree premeditated murder conviction.

The victim was also convicted of felony murder, which is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ."  Tenn. Code Ann. § 39-13-202(a)(2) 2003.  "No culpable mental state is required for conviction [of felony murder] except the intent to commit the enumerated offense[]."  Id. § (b).  In this case, the underlying offense (for which the defendant was also indicted) was especially aggravated robbery, which is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury."  Tenn. Code Ann. § 39-13-403(a) (2003).  See also id. § 39-13-401(a) (defining robbery as an offense that must be committed intentionally or knowingly).  In this case, the defendant admitted to police and testified at trial that he and his fellow gang members went to the victim's residence intending to steal his marijuana.  At the boarding house, the defendant and another man shot and killed the victim, and the defendant took the victim's marijuana, as the three associates had intended.  We conclude that this evidence was sufficient to support the defendant's convictions for felony murder and especially aggravated robbery.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

D. KELLY THOMAS, JR., JUDGE